Filed 7/18/11

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| CALIFORNIA GROCERS ASSOCIATION, | ) ) ) | |
| Plaintiff and Respondent, | ) ) ) | S176099 |
| v. | ) ) | Ct.App. 2/5 B206750 |
| CITY OF LOS ANGELES, | ) ) | Los Angeles County |
| Defendant and Appellant; | ) ) | Super. Ct. No. BC351831 |
| LOS ANGELES ALLIANCE FOR A NEW ECONOMY, | ) ) ) | |
| Intervener and Appellant. | ) ) | |
| _____ | ) | |

The City of Los Angeles, like numerous other municipalities in California and elsewhere, regulates the ability of certain employers to summarily replace the workforce upon acquiring a new business. Is such a worker retention ordinance preempted as intruding upon either matters of health and safety already regulated by the state or matters of employee organization and collective bargaining fully occupied by federal law? We conclude it is not. As well, we conclude the challenged ordinance is fully consistent with both the state and federal equal protection clauses. As the Court of Appeal found the ordinance preempted, we reverse.

1

## FACTUAL AND PROCEDURAL BACKGROUND

In December 2005, the City of Los Angeles (City) adopted the Grocery Worker Retention Ordinance (Ordinance). (L.A. Ord. No. 177,231, adding ch. XVIII, § 181.00 et seq. to L.A. Mun. Code.)[1] For grocery stores of a specific size (15,000 square feet or larger) that undergo a change of ownership, the Ordinance vests current employees with certain individual rights during a 90-day transition period. First, the incumbent owner is to prepare a list of nonmanagerial employees with at least six months' employment as of the date of transfer in ownership, and the successor employer must hire from that list during the transition period. (L.A. Mun. Code, § 181.02.) Second, during that same period, the hired employees may be discharged only for cause. (*Id.*, § 181.03(A)-(C).) Third, at the conclusion of the transition period, the successor employer must prepare a written evaluation of each employee's performance. The Ordinance does not require that anyone be retained, but if an employee's performance is satisfactory, the employer must "consider" offering continued employment. (*Id.*, § 181.03(D).) If the workforce is unionized, however, the union and the employer may agree on terms that supersede the Ordinance. (*Id.*, § 181.06.)

---

[1] The Ordinance mirrors grocery worker retention ordinances adopted by various other California municipalities (see Gardena Mun. Code, ch. 5.10; S.F. Police Code, art. 33D; Santa Monica Mun. Code, ch. 5.40), and is substantially similar to worker retention ordinances for other fields adopted in California (e.g., Berkeley Mun. Code, ch. 13.25 [marina business workers]; Emeryville Mun. Code, ch. 32, § 5-32.1.1(b) [hotel workers]; L.A. Mun. Code, § 183.00 et seq. [hotel workers]; Oakland Mun. Code, ch. 2.36 [hospitality workers]; San Jose Mun. Code, § 25.11.700 et seq. [airport business workers]) and throughout the United States (N.Y.C. Admin. Code, tit. 22, ch. 5, § 22-505 [building service workers]; Philadelphia Mun. Code, ch. 9-2300 [service contract workers]; Providence, R.I., Code of Ord., §§ 2-18.5 [hospitality workers], 14-16 [building service workers]; D.C. Official Code, § 32-101 et seq. [health care, food service, and janitorial workers]).

2

Plaintiff California Grocers Association (Grocers) filed a complaint against the City seeking to enjoin enforcement of the Ordinance on the grounds that it was preempted by provisions of the Health and Safety Code, the Labor Code, and federal labor law, and that it violated the equal protection provisions of the state and federal Constitutions. The Los Angeles Alliance for a New Economy, a nonprofit organization, intervened to defend the Ordinance.

After a two-day bench trial, the trial court entered a judgment enjoining enforcement of the Ordinance, declaring it void on two of the four asserted grounds. The court concluded the Ordinance affected health and sanitation standards for retail food establishments, an area fully occupied by state law, and was on that basis preempted, and further concluded the Ordinance violated equal protection because there was no rational basis for its differential treatment of grocery stores smaller than 15,000 square feet or its permitting employers and unions to contract around the Ordinance's terms.

A divided Court of Appeal affirmed. The majority agreed with the trial court that the California Retail Food Code (Retail Food Code) (Health & Saf. Code, § 113700 et seq.) fully occupied the field of health and sanitation standards for retail food establishments, and the Ordinance had the impermissible purpose and effect of regulating in the same area. It further concluded, contrary to the trial court, that the Ordinance was also preempted by the National Labor Relations Act (NLRA or the Act) (29 U.S.C. § 151 et seq.) because, in the majority's view, federal labor law guaranteed successor employers the right to pick and choose whom they wished to employ, free of local regulation. The majority did not address the trial court's further equal protection conclusions. In contrast, the dissent argued that the Ordinance was neither preempted nor inconsistent with equal protection principles.

We granted review to resolve significant preemption and constitutional questions placing into doubt the validity of this and other similar worker retention ordinances throughout the state.

## DISCUSSION

### I. *State Preemption*

#### A. *Preemption Principles*

Local ordinances and regulations are subordinate to state law. (Cal. Const., art. XI, § 7.) Insofar as a local regulation conflicts with state law, it is preempted and invalid. (*O'Connell v. City of Stockton* (2007) 41 Cal.4th 1061, 1067; *Sherwin-Williams Co. v. City of Los Angeles* (1993) 4 Cal.4th 893, 897.) " ' "A conflict exists if the local legislation ' "*duplicates, contradicts,* or *enters an area fully occupied* by general law, either expressly or by legislative implication." ' " [Citations.]' " (*O'Connell*, at p. 1067, quoting *Sherwin-Williams*, at p. 897; accord, *American Financial Services Assn. v. City of Oakland* (2005) 34 Cal.4th 1239, 1251.)

Only the last of these bases for conflict, field preemption, is at issue here. "Local legislation enters an area 'fully occupied' by general law when the Legislature has expressly manifested its intent to fully occupy the area or when it has impliedly done so in light of recognized indicia of intent." (*Big Creek Lumber Co. v. County of Santa Cruz* (2006) 38 Cal.4th 1139, 1150.) Grocers contend the Ordinance impermissibly intrudes into an area the state has, in the Retail Food Code, expressly reserved for itself. (See Health & Saf. Code, § 113705.) Express field preemption turns on a comparative statutory analysis: What field of exclusivity does the state preemption clause define, what subject matter does the local ordinance regulate, and do the two overlap? (See, e.g., *Big Creek Lumber*, at pp. 1152-1157; *Morehart v. County of Santa Barbara* (1994) 7 Cal.4th 725, 748-

4

751.)  The burden of proving the existence of such an overlap rests on Grocers, as the party asserting preemption.  (*Big Creek Lumber*, at p. 1149.)

B.  *Express Preemption*

We begin with the language of the preemption clause and the Ordinance. Health and Safety Code section 113705's definition of the regulatory field it reserves for the state is clear and precise:  "Except as provided in Section 113709,[2] it is the intent of the Legislature to occupy the whole field of health and sanitation standards for retail food facilities, and the standards set forth in this part and regulations adopted pursuant to this part shall be exclusive of all local health and sanitation standards relating to retail food facilities."  Thus, the state alone may adopt "health and sanitation standards for retail food facilities."  (*Ibid.*)  The remainder of the statutory scheme demonstrates by way of example the precise scope of exclusive state regulation, comprehensively detailing standards for, e.g., employee training on health matters (*id.*, §§ 113947-113947.3), employee health and hygiene (*id.*, §§ 113949-113978), food transportation, storage, and preparation (*id.*, §§ 113980-114057.1), food display and service (*id.*, §§ 114060-114083), food labeling (*id.*, §§ 114087-114094), the design and sanitizing of food preparation areas and utensils (*id.*, §§ 114095-114185.5), and the design and cleanliness of food facilities (*id.*, §§ 114250-114282).[3]

---

**2**      Health and Safety Code section 113709, a savings clause preserving local authority over certain subjects not relevant here, does not affect our disposition of this case.

**3**      As examples of the sorts of concerns addressed and level of detail provided by the Retail Food Code, the statutory scheme specifies, to the degree and minute, the temperatures at which various foods must be stored and cooked (Health & Saf. Code, §§ 113996, 114004), to the hour, how long food contact surfaces may go between cleanings (*id.*, § 114117), and, to the inch, how large food preparation sinks must be (*id.*, § 114163).

5

In contrast, the Ordinance imposes no substantive food safety standards. Its provisions regulate, for certain grocery stores during ownership transitions, how a new owner may select its workforce. (See generally L.A. Mun. Code, §§ 181.02-181.04.) It does not speak to how employees must conduct themselves to ensure sanitation, how food should be handled or transported, how grocery stores should be designed or cleaned, or any of the various other topics for which the Retail Food Code sets out exclusive state standards. The face of the Ordinance thus discloses no incursion into the exclusive realm reserved for the state by Health and Safety Code section 113705; the former regulates employment, not food safety, while the latter regulates food safety, not employment.

In concluding that the Ordinance nevertheless is preempted, the Court of Appeal majority relied on language in the Ordinance's preamble and statements by City officials indicating the City, in passing the Ordinance, was concerned with promoting health and safety. The preamble notes in part: "The City has an interest in ensuring the welfare of the residents of [Los Angeles] through the maintenance of health and safety standards in grocery establishments. Experienced grocery workers with knowledge of proper sanitation procedures, health regulations, and understanding of the clientele and communities they serve are instrumental in furthering this interest." (L.A. Mun. Code, § 181.00.) Remarks by members of the city attorney's office and some city council members during deliberations similarly suggest the promotion of health and safety may have been a City concern.

We may accept for the sake of argument that the promotion of health and safety was one of the City's purposes in passing the Ordinance. That the Ordinance is preempted does not, however, follow. Purpose alone is not a basis

6

for concluding a local measure is preempted.[4]  While we and the Courts of Appeal have occasionally treated an ordinance's purpose as relevant to state preemption analysis (see, e.g., *Lancaster v. Municipal Court* (1972) 6 Cal.3d 805, 809-810; *Bravo Vending v. City of Rancho Mirage* (1993) 16 Cal.App.4th 383, 404-409), we have done so in the context of a nuanced inquiry into the ultimate question in determining field preemption:  whether the effect of the local ordinance is in fact to regulate in the very field the state has reserved to itself.

Thus, in *Cohen v. Board of Supervisors* (1985) 40 Cal.3d 277, we upheld against a preemption challenge a local ordinance requiring a permit to provide an escort service.  The state had impliedly occupied the field with respect to the criminalization of prostitution and sexual conduct.  (See *In re Lane* (1962) 58 Cal.2d 99, 103.)  Although the ordinance's likely purpose was to reduce vice and deter conduct proscribed by the state, this purpose did not support preemption:  "An ordinance is not transformed into a statute prohibiting crime simply because the city uses its licensing power to discourage illegitimate activities associated with certain businesses.  Most licensing ordinances have a direct impact on the enforcement of state laws which have been enacted to preserve the health, safety and welfare of state and local citizens.  This fact does not deprive a municipality of the power to enact them."  (*Cohen*, at p. 299.)  The ordinance in actual effect did not enter the field of criminalizing sexual conduct, but only controlled who might operate an escort service, leaving the regulation of any such conduct to the

---

**4**      To rest preemption analysis solely on considerations of purpose would generate the anomalous circumstance, rejected by the United States Supreme Court, that one jurisdiction's measure might survive preemption, while another identical measure passed in a different jurisdiction might fall, "merely because its authors had different aspirations."  (*Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co.* (2010) 559 U.S. ___ [130 S.Ct. 1431, 1441].)

state; as such, it was not preempted. (*Id.* at pp. 295-296, 299-300; see also *EWAP, Inc. v. City of Los Angeles* (1979) 97 Cal.App.3d 179, 191 [upholding an ordinance regulating picture arcades so as to discourage violations of state law, without criminalizing or imposing any new standard for sexual conduct]; cf. *Lancaster v. Municipal Court*, *supra*, 6 Cal.3d at pp. 809-810 [concluding an ordinance was preempted where its effect was to criminalize aspects of sexual conduct].)

Similarly, in *Bravo Vending v. City of Rancho Mirage*, *supra*, 16 Cal.App.4th 383, a tobacco company challenged a local ordinance forbidding vending machine cigarette sales. The tobacco company contended that, because the ordinance was intended to reduce sales to minors and the state had expressly occupied the field of penal sanctions for sales to minors, the ordinance was preempted. The Court of Appeal found no preemption. While the local ordinance was intended to make less likely violations of the laws against sales to minors, in actual effect it neither expanded upon nor detracted from the state-mandated prohibitions and sanctions for sales. (*Id.* at p. 412.)

More recently, in *Personal Watercraft Coalition v. Marin County Bd. of Supervisors* (2002) 100 Cal.App.4th 129, the Court of Appeal rejected the argument that, because a municipality had adopted an ordinance banning the use of personal watercraft out of a concern for pollution, the ordinance was preempted by federal law prohibiting the adoption of state and local emission standards for nonroad vehicles. The Court of Appeal correctly recognized that the purpose of the federal preemption provision was only to alleviate the problems that would arise from "a multiplicity of conflicting state and local exhaust emission standards." (*Id.* at p. 155.) Consequently, state and local laws were preempted only to the extent they adopted such standards. Laws that simply promoted the

8

same antipollution goals without setting pollution standards were entirely valid. (*Ibid.*)

These cases are on point here. The Retail Food Code does not preempt all laws that have as their purpose the promotion of food health and safety; it preempts only those that establish "health and sanitation standards" for retail food establishments, so as to ensure uniformity for such facilities. (Health & Saf. Code, § 113705.) The Retail Food Code itself dictates those uniform standards, but does not specify by whom they are to be carried out; as far as state law is concerned, a retail food store may employ whomever it likes, so long as those it employs comply with the state's standards for distributing food in a safe and healthful manner. For its part, the Ordinance, like the escort service ordinance in *Cohen v. Board of Supervisors*, *supra*, 40 Cal.3d 277, regulates only who may be hired to engage in certain work, and though it may have been intended in part to reduce violations of state law by those workers, it does not itself add to or subtract from the state's uniform standards of conduct for whoever engages in that work. Like the watercraft ordinance in *Personal Watercraft Coalition v. Marin County Bd. of Supervisors*, *supra*, 100 Cal.App.4th 129, the Ordinance promotes the same goals as the enactment of a higher governmental authority, but does so without entering the field that enactment preempts, i.e., the setting of specific uniform standards. The trial court erred in concluding that, because the Ordinance arguably was intended to enact "a different approach to ensuring food safety than that crafted by the Legislature," ipso facto it was preempted.

Grocers argue, purpose aside, that the Ordinance goes beyond issues of worker retention and *does* impose food sanitation standards. As foundation for this argument, Grocers focus on the portion of the Retail Food Code that regulates employee training and knowledge. (See Health & Saf. Code, §§ 113947-113947.6.) Health and Safety Code section 113947, subdivision (a) requires "[t]he

9

person in charge and all food employees [to] have adequate knowledge of, and . . . be properly trained in, food safety as it relates to their assigned duties."  The Retail Food Code further requires that specified food facilities have either an owner or employee who has received state certification in food safety (see *id.*, §§ 113947.1, subds. (a), (b)(1), 113947.2, 113947.3) or otherwise be able to demonstrate to an enforcement officer that the employees have adequate knowledge of food safety as it relates to their duties (*id.*, § 113947.1, subd. (b)(2)).  For facilities that have just opened, gone through a change in ownership, or otherwise lost their certified food safety specialist, the scheme offers a 60-day grace period.  (*Id.*, subd. (e).) Grocers contend the Ordinance, too, regulates employee qualifications.

Contrary to Grocers' argument, this portion of the Retail Food Code and the Ordinance do not overlap.  The Retail Food Code establishes standards for what certain employees, particularly one certified owner or supervising food service employee, must know or be taught, but does not regulate who must be hired; the Ordinance regulates the pool of nonsupervising, nonmanagerial employees from which a new owner temporarily must hire, but imposes no standards concerning what the hired employees must know or be taught about food safety.  Notably, the Retail Food Code's required certified food safety specialist is by definition a managerial or supervisorial employee,[5] while the Ordinance by its terms expressly excludes from its scope all such employees[6] and thus does not

---

[5]     See Health and Safety Code section 113947.1, subdivision (f) ("The responsibilities of a certified owner or employee . . . shall include the safety of food preparation and service, including ensuring that all employees who handle, or have responsibility for handling, nonprepackaged foods of any kind, have sufficient knowledge to ensure the safe preparation or service of the food, or both.").

[6]     See Los Angeles Municipal Code section 181.01(C) (" 'Eligible Grocery Worker' does not include a managerial, supervisory, or confidential employee.").

10

regulate or restrict in any way an employer's freedom to hire whomever it chooses to satisfy that position. As such, the Ordinance does not intrude upon the field the state has expressly reserved to itself and is not preempted by state law.

## II. *Federal Preemption*

### A. Machinists *Preemption Principles*

We consider as well whether the Ordinance is preempted by the NLRA, a federal law enacted to protect "the right of employees to organize and bargain collectively." (29 U.S.C. § 151.) The supremacy clause of the United States Constitution vests Congress with the power to preempt state law. (*Viva! Internat. Voice for Animals v. Adidas Promotional Retail Operations, Inc.* (2007) 41 Cal.4th 929, 935; see U.S. Const., art. VI, cl. 2.) While Congress may exercise that power by enacting an express preemption provision, the NLRA contains no such provision; indeed, "Congress has not seen fit to lay down even the most general of guides to construction of the Act, as it sometimes does, by saying that its regulation either shall or shall not exclude state action." (*Bethlehem Co. v. State Board* (1947) 330 U.S. 767, 771.) Instead, Grocers contend the Ordinance is impliedly preempted under the *Machinists* doctrine. (*Machinists v. Wisconsin Emp. Rel. Comm'n* (1976) 427 U.S. 132 (*Machinists*).) Determining whether *Machinists* preemption extends here requires that we examine its principles in some depth.

In *Machinists*, *supra*, 427 U.S. 132, the United States Supreme Court considered whether labor or management self-help (economic pressure tactics such as boycotts, strikes, and lockouts used to extract concessions during the collective bargaining process), although neither protected nor prohibited by the NLRA, might nevertheless be " 'deemed privileged against state regulation.' " (*Machinists*, at p. 141.) A union, seeking to pressure an employer to make concessions in negotiations over renewal of an expired collective bargaining

11

agreement, urged its members to refuse all overtime work. A state labor commission, concluding the conduct was neither arguably protected nor arguably prohibited by federal labor law, enjoined the concerted activity as being in violation of state law, and the state supreme court upheld the injunction.

The United States Supreme Court reversed. It explained that even where the NLRA does not address a particular economic weapon, preemption may still apply. "Whether self-help economic activities are employed by employer or union, the crucial inquiry regarding pre-emption is the same: whether 'the exercise of plenary state authority to curtail or entirely prohibit self-help would frustrate effective implementation of the Act's processes.' " (*Machinists*, *supra*, 427 U.S. at pp. 147-148.) Except insofar as the NLRA itself regulates the use of particular economic weapons, Congress intended a "no-fly" zone, with neither states nor the National Labor Relations Board (NLRB) permitted to interfere in the bargaining process by dictating which weapons labor and management might employ in negotiations. "To sanction state regulation of such economic pressure deemed by the federal Act 'desirabl[y] . . . left for the free play of contending economic forces, . . . is not merely [to fill] a gap [by] outlaw[ing] what federal law fails to outlaw; it is denying one party to an economic contest a weapon that Congress meant him to have available.' " (*Machinists*, at p. 150.)

In subsequent years, the United States Supreme Court has extended *Machinists* principles to other instances in which, from the text or structure of the NLRA, it could infer Congress intended the subject matter to be free from state or municipal regulation. Thus, in *Golden State Transit Corp. v. Los Angeles* (1986) 475 U.S. 608, 618, again addressing regulation of economic weapons in the bargaining process, the United States Supreme Court concluded the City of Los Angeles was preempted from conditioning renewal of a taxicab company's operating license on the company's settling a labor dispute. The taxi drivers were

12

permitted under the NLRA to strike to pressure the taxi company, and the taxi company was permitted to resist that pressure and seek to outlast the drivers. The city, by requiring the taxi company to settle in order to keep operating, was effectively placing a time limit on the company when none was contemplated, thereby interfering with its use of permitted economic weapons, and was imposing an obligation to agree where the text and legislative history of the NLRA contemplated only an obligation to bargain. (*Golden State Transit*, at pp. 615-617.)

Most recently, in *Chamber of Commerce of United States v. Brown* (2008) 554 U.S. 60, the United States Supreme Court concluded California could not prohibit employers who received state funding from using those funds to influence support for or opposition to union organizing. (See Gov. Code, §§ 16645.2, 16645.7.) Reviewing the history of federal labor regulation, the court noted Congress had "expressly preclude[d] regulation of speech about unionization 'so long as the communications do not contain a "threat of reprisal or force or promise of benefit." ' " (*Brown*, at p. 68; see 29 U.S.C. § 158(c).) As well, Congress could have included in section 8(a) and (b) of the NLRA (see 29 U.S.C. § 158(a), (b)) further limits on pro- and anti-unionization advocacy; the limits it chose to include could thus be seen as this-much-and-no-more determinations by Congress. Accordingly, state law was preempted. (*Brown*, at p. 69.)

The foregoing cases each dealt with circumstances where, from the structure of the NLRA, it was evident Congress had spoken to a particular topic and no state interference could be countenanced. A second line of post-*Machinists* decisions, by contrast, has articulated significant limits on the scope of *Machinists* preemption arising from the fact the NLRA is a regulation of process, not substance.

13

The NLRA was enacted "to remedy '[t]he inequality of bargaining power between employees who do not possess full freedom of association or actual liberty of contract, and employers who are organized in the corporate or other forms of ownership association.' " (*Metropolitan Life Ins. Co. v. Massachusetts* (1985) 471 U.S. 724, 753 (*Metropolitan Life*), quoting 29 U.S.C. § 151.) "One of the ultimate goals of the Act was the resolution of the problem of 'depress[ed] wage rates and the purchasing power of wage earners in industry,' 29 U. S. C. § 151, and 'the widening gap between wages and profits,' 79 Cong. Rec. 2371 (1935) (remarks of Sen. Wagner), thought to be the cause of economic decline and depression." (*Metropolitan Life*, at p. 754.) Congress addressed this problem not by directly dictating particular wage levels, but by establishing procedures for employee organization and collective bargaining that, it hoped, would result in fairer negotiations and higher wages. (*Ibid.*) The resulting law was "concerned primarily with establishing an equitable process for determining terms and conditions of employment, and not with particular substantive terms of the bargain that is struck when the parties are negotiating from relatively equal positions." (*Id.* at p. 753.)

The United States Supreme Court in *Metropolitan Life* analyzed whether the process-oriented NLRA was intended to have any effect on local employment laws of general application. A Massachusetts law required that employee health care plans include certain minimum benefits, a subject that otherwise might have been addressed in collective bargaining. Rejecting the argument that *Machinists* preemption applied, the Supreme Court drew a line between laws that regulate process and those that regulate substance: "No incompatibility exists . . . between federal rules designed to restore the equality of bargaining power, and state or federal legislation that imposes minimal substantive requirements on contract terms negotiated between parties to labor agreements, at least so long as the

14

purpose of the state legislation is not incompatible with these general goals of the NLRA." (*Metropolitan Life*, *supra*, 471 U.S. at pp. 754-755.)  While the NLRA facilitates collective bargaining over the terms of employment, it does not dictate—nor does it preclude states from dictating—any particular substantive terms of employment.

As the Supreme Court further explained, because the NLRA regulates only the process of organizing and bargaining, "[f]ederal labor law in this sense is interstitial, supplementing state law where compatible, and supplanting it only when it prevents the accomplishment of the purposes of the federal Act." (*Metropolitan Life*, *supra*, 471 U.S. at p. 756.)  The NLRA operates against the background of the vast tapestry of substantive state regulation of employer-employee relations—the " 'backdrop of state law that provided the basis of congressional action.' " (*Metropolitan Life*, at p. 757.)  Congress did not intend "to disturb the myriad state laws then in existence that set minimum labor standards, but were unrelated in any way to the processes of bargaining or self-organization." (*Id.* at p. 756.)  Massachusetts thus could exercise its broad police powers to regulate the terms of employee health benefits without trespassing into any area cordoned off by the NLRA for exclusive federal regulation.

In *Fort Halifax Packing Co. v. Coyne* (1987) 482 U.S. 1 (*Fort Halifax*), the United States Supreme Court extended these principles to a state law guaranteeing employees a severance payment in the event of a plant closing.  The high court reiterated that "the NLRA is concerned with ensuring an equitable bargaining process, not with the substantive terms that may emerge from such bargaining." (*Id.* at p. 20.)  States may regulate what might otherwise be the subject of negotiation:  " '[T]here is nothing in the NLRA . . . which expressly forecloses all state regulatory power with respect to those issues . . . that may be the subject of collective bargaining.' " (*Id.* at pp. 21-22.)  Given that " 'Congress developed the

15

framework for self-organization and collective bargaining of the NLRA within the larger body of state law promoting public health and safety' " (*id.* at p. 22), Maine could by statute provide employees some minimal economic security, in the event of a plant closing, without running afoul of the NLRA.

Our own decision in *Industrial Welfare Com. v. Superior Court* (1980) 27 Cal.3d 690 presaged the high court's later recognitions of the power of localities to promote public health and safety through regulation of the employer-employee relationship without falling prey to *Machinists* preemption. We considered there whether federal preemption precluded the state Industrial Welfare Commission from issuing wage orders regulating the minimum wages, maximum hours, and conditions of employment for employees in a range of industries. We rejected the argument out of hand, relying on what we viewed as settled precedent that "the federal labor laws do not 'preempt [] . . . the field of regulating working conditions . . . .' " (*Industrial Welfare Com.*, at p. 728, fn. 16, quoting *Terminal Assn. v. Trainmen* (1943) 318 U.S. 1, 7.) Instead, we recognized preemption was confined to circumstances in which local regulation interfered with the process of organizing and bargaining, including the use of economic weapons to achieve particular bargaining goals. (*Industrial Welfare Com.*, at p. 728, fn. 16.)

As these cases demonstrate, at the core of *Machinists* preemption is the principle that, in specific instances, one may discern from the text and structure of the NLRA a basis for inferring that Congress affirmatively intended to leave a particular subject free from further NLRB and state and local government regulation. "*Machinists* pre-emption is based on the premise that ' "Congress struck a balance of protection, prohibition, and laissez-faire in respect to union organization, collective bargaining, and labor disputes." ' " (*Chamber of Commerce of United States v. Brown*, *supra*, 554 U.S. at p. 65, quoting *Machinists*, *supra*, 427 U.S. at p. 140, fn. 4.) "[A]s in any pre-emption analysis,

16

' "[t]he purpose of Congress is the ultimate touchstone." ' " (*Metropolitan Life*, *supra*, 471 U.S. at p. 747.)

Given that Congress's purpose was to regulate the process of establishing terms of employment, not the content of those terms (*Metropolitan Life*, *supra*, 471 U.S. at p. 753; *Fort Halifax*, *supra*, 482 U.S. at p. 20), it follows that the areas Congress intended to leave free of local regulation are those relating to the process by which an employment agreement is reached:  matters of self-organization and collective bargaining.  (See *Metropolitan Life*, at p. 751.)  In sharp distinction, because the NLRA is not a federal code of employment law, *Machinists* preemption does not extend to local establishment of substantive employment terms:  "Such regulation provides protections to individual union and nonunion workers alike, and thus 'neither encourage[s] nor discourage[s] the collective-bargaining processes that are the subject of the NLRA.' " (*Fort Halifax*, at pp. 20-21; see also *Southern California Edison Co. v. Public Utilities Com.* (2006) 140 Cal.App.4th 1085, 1100 [Local employment regulation is permitted "as long as the purpose of the law or regulation is not incompatible with the general goals of the NLRA to restore the equality of bargaining power and resolve the problem of depressed wages."].)

With these principles in mind, we consider whether the text or structure of the NLRA evidences any intent to preclude worker retention ordinances such as the one at issue here.

B.  *Application to the Ordinance*

We begin with an initial presumption against preemption.  (E.g., *Building & Constr. Trades Council v. Associated Builders & Contractors of Mass./R. I., Inc.* (1993) 507 U.S. 218, 224.)  This presumption is particularly heavy here because the subject matter, the employer-employee relationship, is one traditionally regulated by state and local governments under their police powers.

17

(*Fort Halifax*, *supra*, 482 U.S. at p. 21 ["[P]re-emption should not be lightly inferred in this area, since the establishment of labor standards falls within the traditional police power of the State."].)  Thus, we consider whether there is evidence of a " ' "*clear and manifest*" ' " congressional intent (*Bronco Wine Co. v. Jolly* (2004) 33 Cal.4th 943, 957) to bar at any level the regulation of employee retention during ownership transitions (see *Metropolitan Life*, *supra*, 471 U.S. at p. 749).

Examining the text and structure of the NLRA, we discern no evidence that Congress affirmatively intended to leave the subject of employee retention unregulated by states and municipalities.  On the subject of employee hiring and firing, the text of the NLRA is, with one notable exception, resoundingly silent. It neither guarantees nor prohibits the retention of employees; it does not affirmatively protect new employers' latitude to hire and fire whomever they please, nor does it address in any way the power of states and localities to regulate the subject.  The only portion of the NLRA to speak to these matters, section 8(a)(3), protects employees from discrimination on the basis of union affiliation; an employer may not use the power to hire and fire to exercise anti-union animus and eliminate pro-union employees from its workforce.  (See 29 U.S.C. § 158(a)(3).)

This silence leaves unrebutted the initial presumption that Congress did not intend preemption.  The NLRA's statutory text does not disturb state and local authority to address, as these entities see fit, matters of hiring and firing, authority traditionally recognized as a core incident of their police power.  (See *De Canas v. Bica* (1976) 424 U.S. 351, 356 ["States possess broad authority under their police powers to regulate the employment relationship to protect workers within the State."].)  Thus it is that states and localities have long been permitted to provide common law wrongful discharge remedies (e.g., *Tameny v. Atlantic Richfield Co.*

18

(1980) 27 Cal.3d 167) and enact statutes of general application regulating hiring and firing (e.g., Gov. Code, § 12900 et seq. [Cal. Fair Employment & Housing Act]) without intruding upon the NLRA's narrowly tailored concerns.

The congressional silence concerning the subject matter of the Ordinance distinguishes this case from those where the United States Supreme Court has found *Machinists* preemption. (See *Machinists*, *supra*, 427 U.S. 132.) Without exception, preemption in each was traceable in part to specific statutory language evincing a congressional intent to regulate only at the federal level. (See *Chamber of Commerce of United States v. Brown*, *supra*, 554 U.S. at pp. 67-69 [preempting a statute that effectively limited employer speech about union organizing, where Congress in §§ 7, 8(a), 8(b), and 8(c) of the NLRA (29 U.S.C. §§ 157, 158(a), (b), (c)) already had regulated the extent to which employer speech should be permitted]; *Golden State Transit Corp. v. Los Angeles*, *supra*, 475 U.S. at pp. 614-618 [preempting municipal action that compelled a settlement, where Congress in § 8(d) of the NLRA (29 U.S.C. § 158(d)) had imposed only a duty to bargain, not to agree]; *Machinists*, at pp. 143-151 [preempting a state bar on slowdowns, where Congress in § 8 of the NLRA (29 U.S.C. § 158) had already identified those economic weapons it found necessary to bar]; *Teamsters Union v. Morton* (1964) 377 U.S. 252, 258-260 [preempting regulation of economic weapons, where Congress had already spoken in §§ 7 and 8 of the NLRA (29 U.S.C. §§ 157, 158) to the availability of economic weapons in obtaining negotiating concessions, and specifically to secondary boycotts in 29 U.S.C. § 187].)

Instead, the Ordinance on its face appears of a piece with other state and local regulations upheld against claims of *Machinists* preemption, a part of the background tapestry of state and local laws against which unions and employers may negotiate when reaching the terms of a collective bargaining agreement. While the Ordinance regulates the existence of the employment relationship rather

19

than just its terms, this distinction is not crucial; federal courts routinely have upheld as not preempted under *Machinists* employment laws that broadly regulate hiring and firing. (See *St. Thomas-St. John Hotel v. Govern. of U.S. VI* (3d Cir. 2000) 218 F.3d 232, 243 [upholding a Virgin Islands wrongful termination statute as a minimum substantive requirement permitted under *Metropolitan Life* and *Fort Halifax*]; *Peabody Galion v. Dollar* (10th Cir. 1981) 666 F.2d 1309, 1316-1319 [upholding an Okla. wrongful discharge statute against claimed *Machinists* preemption].) Like the health benefits law in *Metropolitan Life*, *supra*, 471 U.S. 724, and the severance benefits law in *Fort Halifax*, *supra*, 482 U.S. 1, the Ordinance regulates the terms and conditions of employment, extending the benefit of a potential temporary extension of employment to each employee individually, rather than conferring a collective right, and applying the benefit to all employees equally, irrespective of union or nonunion status. (See *Fort Halifax*, at pp. 20-21; *Metropolitan Life*, at p. 755.)[7]

What the Ordinance does not do, in contrast, is " '[enter] into the substantive aspects of the bargaining process to an extent Congress has not countenanced.' " (*Machinists*, *supra*, 427 U.S. at p. 149.) It does not regulate the

---

[7] The Ordinance's neutrality is essential to its validity. Just as employment regulations aimed solely at unionized workers may intrude into aspects of organizing and bargaining Congress intended the states not to regulate, so may regulations that apply only to nonunionized workers and select out unionized workers for disfavored status be preempted as forcing employees to choose between exercising their right to enter a collective bargaining agreement and having their state-granted employment rights enforced. (See *Livadas v. Bradshaw* (1994) 512 U.S. 107, 116-118.) In contrast, employment regulations, such as the 90-day retention period imposed by the Ordinance, that "affect union and nonunion employees equally . . . neither encourage nor discourage the collective-bargaining processes that are the subject of the NLRA." (*Metropolitan Life*, *supra*, 471 U.S. at p. 755.)

process by which a bargaining agreement may be reached. Nor does the Ordinance speak directly to the process of organizing; rather, it temporarily preserves the status quo, whatever that might be, whether the workforce is unionized or not. (See *Metropolitan Life*, *supra*, 471 U.S. at p. 755 ["Nor do [local labor and employment standards] have any but the most indirect effect on the right of self-organization established in the Act."].) And, while the Ordinance does confer on each employee, as an individual, certain rights the individual employees might otherwise have obtained only through organizing and collective bargaining, it is well established that so doing is no basis for *Machinists* preemption. (See *Fort Halifax*, *supra*, 482 U.S. at pp. 21-22; *Metropolitan Life*, at pp. 751-758; *Malone v. White Motor Corp.* (1978) 435 U.S. 497, 504-505.)[8]

While recognizing that the Ordinance on its face does not regulate organizing or bargaining, Grocers contends it is nevertheless preempted because of its indirect effects on those subjects. Grocers' principal argument, accepted by the Court of Appeal majority, is that the Ordinance alters how the NLRB would

[8] Grocers argue that the Ordinance cannot qualify as a generally applicable employment standard because it regulates only a single industry. (See *Chamber of Commerce of U.S. v. Bragdon* (9th Cir. 1995) 64 F.3d 497, 504.) However, the Ninth Circuit Court of Appeals has effectively repudiated *Bragdon* (see *Associated Buil. and Contrac., Sout. Cal. v. Nunn* (9th Cir. 2004) 356 F.3d 979, 990), and a majority of other circuits have limited *Bragdon* to its facts (see *Rondout Elec., Inc. v. NYS Dept. of Labor* (2d Cir. 2003) 335 F.3d 162, 169; *St. Thomas-St. John Hotel v. Govern. of U.S. VI*, *supra*, 218 F.3d at p. 244; but see *520 South Michigan Ave. Associates v. Shannon* (7th Cir. 2008) 549 F.3d 1119, 1131-1137 [following *Bragdon*]). *Bragdon* also has been squarely rejected by the only previous California decision to consider its reasoning. (See *Southern California Edison Co. v. Public Utilities Com.*, *supra*, 140 Cal.App.4th at pp. 1103-1104.) Nothing in the NLRA indicates Congress intended to prevent states and localities from attacking employment problems industry by industry, as they traditionally have. (See, e.g., *Martinez v. Combs* (2010) 49 Cal.4th 35, 57 [discussing Industrial Welfare Com.'s historic industry-by-industry approach to wage orders].)

decide successorship questions, i.e., whether and to what extent labor liabilities and bargaining or contractual obligations should follow when ownership of a unionized business is transferred from one entity to another.

The NLRA does not speak to successorship. Consequently, successorship questions are governed by federal common law. (*Howard Johnson Co. v. Hotel Employees* (1974) 417 U.S. 249, 255-256.) In a trilogy of cases (*John Wiley & Sons v. Livingston* (1964) 376 U.S. 543; *NLRB v. Burns Security Services* (1972) 406 U.S. 272; *Howard Johnson Co.*, *supra*, 417 U.S. 249), the United States Supreme Court outlined the circumstances and considerations that might lead a court to conclude the new owner of a business should be bound by an existing bargaining agreement entered into by its predecessor or have an independent duty to negotiate with a union that had represented the predecessor workforce.[9]

A premise of Grocers' general argument is that these cases ratify a new owner's right, untouchable by state or local regulation, not to hire its predecessor's employees upon acquiring a new store. The Court of Appeal majority agreed; reversing the trial court on this point, it embraced the existence of such a right as a basis for federal preemption. Upon close examination, these authorities do not support Grocers' claim.

The language Grocers and the Court of Appeal majority rely upon traces to *NLRB v. Burns Security Services*, *supra*, 406 U.S. 272. In the course of analyzing

---

[9]     As the court subsequently summarized, successorship depends on a consideration of the "totality of the circumstances," including "whether the business of both employers is essentially the same; whether the employees of the new company are doing the same jobs in the same working conditions under the same supervisors; and whether the new entity has the same production process, produces the same products, and basically has the same body of customers." (*Fall River Dyeing & Finishing Corp. v. NLRB* (1987) 482 U.S. 27, 43.)

22

a new employer's legal obligations, the United States Supreme Court explained: "The [NLRB] has never held that *the National Labor Relations Act itself* requires that an employer who submits the winning bid for a service contract or who purchases the assets of a business be obligated to hire all of the employees of the predecessor though it is possible that such an obligation might be assumed by the employer." (*Id.* at p. 280, fn. 5, italics added.) The Supreme Court reiterated the point the following year, noting that "the purchaser [of a business] is not obligated *by the Act* to hire any of the predecessor's employees . . . ." (*Golden State Bottling Co. v. NLRB* (1973) 414 U.S. 168, 184, fn. 6, italics added, citing *Burns*, at p. 280, fn. 5.)

Notwithstanding these statements, the petitioner union in *Howard Johnson Co. v. Hotel Employees*, *supra*, 417 U.S. 249, contended federal common law and the existing collective bargaining agreement should be interpreted so that " 'the successor does not have the right not to hire . . . .' " (*Id.* at p. 261, fn. 7.) The Supreme Court rejected the argument: "What the Union seeks here is completely at odds with the basic principles this Court elaborated in *Burns*. We found there that nothing in the federal labor laws 'requires that an employer . . . who purchases the assets of a business be obligated to hire all of the employees of the predecessor though it is possible that such an obligation might be assumed by the employer.' " (*Id.* at p. 261, quoting *NLRB v. Burns Security Services*, *supra*, 406 U.S. at p. 280, fn. 5, and citing *Golden State Bottling Co. v. NLRB*, *supra*, 414 U.S. at p. 184, fn. 6.) The court thereafter used shorthand for the principle that the NLRA and federal common law do not compel retention of predecessor employees. (See *Howard Johnson*, at p. 262 ["Clearly, *Burns* establishes that Howard Johnson had the right not to hire any of the former Grissom employees, if it so desired."]; *id.* at p. 264 [recognizing that "employees of the terminating employer have no legal right to continued employment with the new employer" and acknowledging "the

23

new employer's right to operate the enterprise with his own independent labor force"]; see also *Fall River Dyeing & Finishing Corp. v. NLRB*, *supra*, 482 U.S. at p. 40 [explaining that *Burns* held a "successor is under no obligation to hire the employees of its predecessor"].)

That the United States Supreme Court was using "right" in this instance in the sense of a Hohfeldian privilege[10] against any asserted duty arising from federal common law or an existing collective bargaining agreement to hire particular workers, and not to describe an immunity from state or local regulation of such hiring,[11] is clear from context. This was what *Burns* had said (see *NLRB v. Burns Security Services*, *supra*, 406 U.S. at p. 280, fn. 5), what *Golden State Bottling* had said (see *Golden State Bottling Co. v. NLRB*, *supra*, 414 U.S. at p. 184, fn. 6), and what *Howard Johnson* itself said when it explained that "nothing in the federal labor laws 'requires' " a business purchaser to hire predecessor employees. (*Howard Johnson Co. v. Hotel Employees*, *supra*, 417 U.S. at p. 261.)[12] *Howard Johnson* was not a preemption case and did not at any point contemplate whether a successor's hiring choices might be regulated or restricted by sources other than an existing collective bargaining agreement or federal common law. It thus does not

---

**10** See Hohfeld, Fundamental Legal Conceptions as Applied in Judicial Reasoning and Other Legal Essays (1919) pp. 38-50 (explaining a "privilege" as the negation of a duty to another).

**11** As Justice Kennedy has explained, *Machinists* preemption arises when the NLRA confers on an entity in "the familiar Hohfeldian terminology . . . an immunity from" state and local regulation. (See *Golden State Transit Corp. v. Los Angeles* (1989) 493 U.S. 103, 115 (dis. opn. of Kennedy, J.).)

**12** Indeed, it was what the court had said as far back as 1937. (See *Labor Board v. Jones & Laughlin* (1937) 301 U.S. 1, 45 ["*The Act* does not interfere with the normal exercise of the right of the employer to select its employees or to discharge them." (Italics added.)].)

24

resolve the preemption issue here.  (See *R. A. V. v. St. Paul* (1992) 505 U.S. 377, 386, fn. 5 ["It is of course contrary to all traditions of our jurisprudence to consider the law on this point conclusively resolved by broad language in cases where the issue was not presented or even envisioned."].)[13]

The dissent's assertion otherwise, viz., that the NLRA was founded on and assumes an employer's unfettered right to select its employees, cannot withstand historical scrutiny.  For decades, the United States Supreme Court had invoked employer liberty of contract to strike down employee-protective legislation.  (See, e.g., *Adair v. United States* (1908) 208 U.S. 161, 174 [holding unconstitutional a federal ban on yellow-dog contracts conditioning hiring on an agreement not to join a union because "it is not within the functions of government . . . to compel any person in the course of his business and against his will to accept or retain the personal services of another . . ."]; see also *Coppage v. Kansas* (1915) 236 U.S. 1, 9-21 [invalidating a state ban on identical grounds].)  Far from yielding to such edicts, Congress in the NLRA defied them.  (See 29 U.S.C. § 158(a)(3) [prohibiting yellow-dog contracts].)[14]  The Supreme Court acceded to this

---

[13]    We observe that the United States Court of Appeals for the District of Columbia Circuit, considering essentially the identical claim, viz., that successorship principles compelled preemption of a local 90-day retention ordinance, has similarly concluded that nothing in the NLRA guarantees to new employers the right to refuse to hire predecessor employees, or even the right to refuse to recognize a union constituted of them; thus, "[a]pplication of the successorship doctrine under [a 90-day retention ordinance] . . . would not require the employer to do anything that it has a right under the NLRA to refuse."  (*Wash. Serv. Contractors v. Dist. of Columbia* (D.C. Cir. 1995) 54 F.3d 811, 817, cert. den. (1996) 516 U.S. 1145.)

[14]    If an employer's liberty of contract to hire whom it chooses truly were a foundation of the NLRA, the Act's proponents would have mentioned as much in support of the measure.  They did not.  (See, e.g., Remarks of Sen. Wagner, 79 Cong. Rec. 2371 (daily ed. Feb. 21, 1935) [the NLRA, also known as the Wagner

*(footnote continued on next page)*

25

judgment, reversing course and holding that both Congress and the several states could constrict an employer's freedom to hire without violating liberty of contract. (See *Labor Board v. Jones & Laughlin*, *supra*, 301 U.S. at pp. 43-46 [rejecting liberty of contract challenge to the NLRA]; *Lincoln Union v. Northwestern Co.* (1949) 335 U.S. 525, 534-537 [rejecting *Adair* and *Coppage* and upholding a state's right similarly to regulate employer hiring].)  To start from the premise that the NLRA is founded upon employer liberty of contract, as the dissent does, is to stand history on its head.[15]

We think the closer question is whether, as Grocers contend, the Ordinance is preempted because its indirect effects impermissibly intrude on successorship determinations that Congress intended to leave free of local regulation.  The party asserting preemption, Grocers, has the burden of demonstrating both the minor and major premises:  that the Ordinance intrudes on successorship determinations,

---

*(footnote continued from previous page)*

Act, "merely provides that employees, if they desire to do so, shall be free to organize for their mutual protection or benefit"]; Remarks of Sen. Wagner, 79 Cong. Rec. 6184 (daily ed. Apr. 23, 1935) [decrying employers' abuse of their ability to hire and fire as an impediment to economic recovery and describing the NLRA as a corrective measure]; Sen.Rep. No. 74-573, 1st Sess. pp. 1-4 (1935) [discussing the NLRA's purposes without mentioning protection of employer liberty of contract].)  Instead, it was the NLRA's opponents who invoked employer liberty of contract in arguing against the Act's constitutionality.  (See, e.g., Remarks of Sen. Hastings, 79 Cong. Rec. 7676-7680 (daily ed. May 15, 1935).)

[15]   The dissent acknowledges the NLRA enacted what were new, fiercely contested restrictions on an employer's liberty of contract.  In so doing, the dissent implicitly surrenders the larger point as well:  the NLRA addresses employer liberty of contract solely to limit it; employer liberty of contract was defended only by those who opposed the Act.  (*Ante*, at fn. 14; see also *Labor Board Cases* (1937) 301 U.S. 76, 103 (dis. opn. of McReynolds, J.) [arguing the NLRA should be struck down for violating an employer's right to "freely select[] those to whom his [business] operations are to be entrusted"].)

and that Congress did not want such indirect effects. (See *Bronco Wine Co. v. Jolly*, *supra*, 33 Cal.4th at pp. 956-957.) Because neither premise has been established, we decline to find preemption on this basis as well.

The successorship inquiry is highly fact dependent, to be decided on a case-by-case basis after consideration of numerous factors. (See *Fall River Dyeing & Finishing Corp. v. NLRB*, *supra*, 482 U.S. at p. 43; *Howard Johnson Co. v. Hotel Employees*, *supra*, 417 U.S. at p. 256.) The United States Supreme Court has not had occasion to consider whether in assessing business continuity for successorship purposes a temporary, involuntary retention of a workforce is materially different from a permanent, voluntary retention, but language in the court's opinions supports the view that it is. (See *Fall River Dyeing*, at p. 41 [considering as relevant to successorship whether a "new employer makes a conscious decision" to retain employees, because it demonstrates "the employer *intends* to take advantage of the trained work force of its predecessor"]; *NLRB v. Burns Security Services*, *supra*, 406 U.S. at p. 278 [upholding the imposition of a duty to bargain based in part on the fact a successor employer had "selected as its work force the employees of the previous employer"].)

The NLRB likewise has not formally spoken to the effect of a 90-day retention ordinance on the successorship inquiry, but several of the agency's administrative law judges (ALJ's) have. In *United States Services Industries, Inc.* (NLRB Dec. 13, 1995, No. 5-CA-24575 (1995 NLRB Lexis 1151, *11-*13)), an ALJ imposed a bargaining obligation on a new employer because there was substantial business continuity, as the employer had conceded. But notwithstanding that concession, the employer argued it should not succeed to the predecessor's bargaining obligation because its initial hiring was dictated by a temporary retention ordinance. Because the NLRB had not as yet formally

27

differentiated between voluntary and involuntary initial hiring, the ALJ, not feeling at liberty to establish new precedent, rejected the argument. (*Id.* at p. \*12.)

More helpful in discerning the current federal rule is *M&M Parkside Towers LLC* (NLRB Jan. 30, 2007, No. 29-CA-27720 (2007 NLRB Lexis 27)). There, an ALJ found an obligation to bargain where the new employer was running the same business with the same employees, who had been initially hired pursuant to a 90-day retention ordinance but thereafter retained voluntarily based on their satisfactory performance. (*Id.* at pp. \*11-\*14.) Although the employer argued that in the absence of a retention ordinance it would not have hired the predecessor's employees, the ALJ rejected the argument inter alia for want of proof. Because the employer had offered no lawful, nondiscriminatory reason for why it would have refused to hire the predecessor employees, it had failed to establish as a factual matter that the retention ordinance affected the initial hiring. (*Id.* at p. \*13.)

Of significance, the ALJ embraced the NLRB general counsel's argument that the obligation to bargain as a successor arose only *after* expiration of the initial 90-day period. During the temporary retention period, whether the new employer would ultimately retain a majority, or indeed any, of the predecessor workforce was unclear. Only on day 113—when the new employer was free of any retention ordinance restrictions, had evaluated each employee's performance, had judged each satisfactory, and had voluntarily extended to each an offer of permanent employment—did a bargaining obligation attach. (*M&M Parkside Towers LLC*, *supra*, 2007 NLRB Lexis 27, at pp. \*6-\*8, \*15-\*18.)[16]

---

[16] A similar result would have obtained if the employer had voluntarily offered permanent employment to a majority of its predecessor's employees

*(footnote continued on next page)*

Summarizing the import of these decisions, the federal district court in *Rhode Island Hospitality Assn. v. City of Providence* (D.R.I. Mar. 31, 2011, No. 09-527-ML) __ F.Supp.2d ___ [2011 U.S. Dist. Lexis 34821] recently concluded: "[E]xisting case law indicates that the successor employer will be obligated to bargain with [a union] only if the successor employer retains its predecessor's employees beyond the mandatory employment period or if it extends an offer for permanent employment prior to expiration of the mandatory retention period." (*Id.* at pp. *39-*40.) We agree. Until that point, the predecessor's employees are essentially probationary and no basis exists for concluding one of the prerequisites of a successorship bargaining obligation, the hiring of a majority of the predecessor's employees (see *Fall River Dyeing & Finishing Corp. v. NLRB*, *supra*, 482 U.S. at p. 47; *NLRB v. Burns Security Services*, *supra*, 406 U.S. at p. 278), will come to pass. It follows that retention ordinances like the Ordinance here do not dictate the outcomes of the successorship inquiry in any way that would call for *Machinists* preemption. (*Rhode Island Hospitality Assn.*, at pp. *41-*42; see also *Wash. Serv. Contractors v. Dist. of Columbia*, *supra*, 54 F.3d at pp. 816-817.)

Additionally, we can discern in the NLRA no clear and manifest congressional intent to foreclose indirect impacts on successorship. As with any preemption question, " ' "[t]he purpose of Congress is the ultimate touchstone" ' " (*Metropolitan Life*, *supra*, 471 U.S. at p. 747), and on this point we find neither textual nor historical support. Successorship is a question of federal common law because "[n]o provision of the [NLRA] even mentions successorship." (McLeod,

---

*(footnote continued from previous page)*

before expiration of the 90 days. (*M&M Parkside Towers LLC*, *supra*, 2007 NLRB Lexis 27, at p. *17.)

*Rekindling Labor Law Successorship in an Era of Decline* (1994) 11 Hofstra Lab. L.J. 271, 342, fn. 289.) By ignoring entirely the issue of successorship, Congress left no indication of any views on the matter. Accordingly, nothing suggests it intended states and their subdivisions to be displaced from regulating in any otherwise permissible way that could affect, even incidentally, how a federal court or agency ultimately might decide an individual successorship question.[17]

In a related vein, Grocers contend the Ordinance affects successorship by preserving unionized workplaces intact, preventing a new owner from hiring without regard to union status, and placing new owners at risk from unfair labor practice charges if they elect not to retain a significant portion of the workforce after expiration of the temporary 90-day window. What these arguments omit is that the Ordinance applies equally to unionized *and* nonunionized workplaces. It does not selectively preserve or favor unionization or unionized workers; it simply preserves, temporarily, the status quo, whatever that might be. Just as an employer taking over a formerly unionized workplace might, if left to its own devices, hire a less union-friendly workforce through regression to the mean,

---

**17** We do not deal here with legislation whereby a state or locality has specifically regulated the collective bargaining process, either by imposing on state-defined successors a duty to bargain and assessing state law sanctions for the refusal to bargain (*Com. Edison Co. v. Intern. Broth. of Elec. Workers* (N.D.Ill. 1997) 961 F.Supp. 1169, 1181-1183) or by obligating state-defined successors to agree to the terms of existing bargaining agreements on a going-forward basis rather than negotiate their own terms with any duly authorized bargaining representative (*United Steelworkers v. St. Gabriel's Hosp.* (D.Minn. 1994) 871 F.Supp. 335, 342-344). (See *Rhode Island Hospitality Assn. v. City of Providence*, *supra*, __ F.Supp.2d at p. ___ [2011 U.S. Dist. Lexis 34821, at pp. *41-*42] [distinguishing retention ordinances from such direct regulations of the bargaining process].) Such regulations of the very subject matter Congress expressly did choose to regulate in enacting the NLRA understandably are preempted.

rather than because of any animus, so might an employer taking over a formerly nonunionized or even anti-union workplace through a similar effect tend to wind up with a more pro-union workforce in the absence of the Ordinance. In the aggregate, a new owner hiring nonmanagement employees from the pool dictated by the Ordinance is neither more nor less likely to wind up with pro-union workers than if it were to hire freely from the workforce at large, assuming anti-union animus truly plays no part in its hiring decisions, as the NLRA demands. (29 U.S.C. § 158(a)(3); *Howard Johnson Co. v. Hotel Employees*, *supra*, 417 U.S. at p. 262, fn. 8; *NLRB v. Burns Security Services*, *supra*, 406 U.S. at pp. 280-281, fn. 5; *Phelps Dodge Corp. v. Labor Board* (1941) 313 U.S. 177, 183-185.)

Nor does the Ordinance place the new owner at greater risk of an unfair labor practice charge than were there no Ordinance. Irrespective of the Ordinance, a new owner would be subject to an unfair labor practice charge if it manipulated its hiring specifically to discriminate against union members and avoid successorship obligations. (*Great Lakes Chemical Corp. v. N.L.R.B.* (D.C. Cir. 1992) 967 F.2d 624, 627-628; see *Howard Johnson Co. v. Hotel Employees*, *supra*, 417 U.S. at p. 262, fn. 8.) In deciding whom to hire from the Ordinance pool and whom to retain or dismiss at the conclusion of the 90-day period, a new owner has the same freedom to choose employees without regard to union status or sentiment, and the same theoretical exposure to an unfair labor practice charge if it were to allow anti-union animus to enter its decisionmaking, as it would without the Ordinance.[18]

---

[18]    More generally, there is, as the District of Columbia Circuit has recognized, no federal right to a nonunion workplace. (See *Wash. Serv. Contractors v. Dist. of Columbia*, *supra*, 54 F.3d at p. 817.) What matters under the NLRA is the employees' choice of a bargaining representative (or no representative). (E.g., *Labor Board v. Jones & Laughlin*, *supra*, 301 U.S. at p. 33 [The NLRA

*(footnote continued on next page)*

Grocers posit the hypothetical of a union organizing and being named bargaining representative for the workplace within the first 90 days, then filing an unfair labor practice charge if many or most of the employees are discharged and the new employer refuses to recognize the union. They do not explain how this scenario is a particular risk occasioned by the Ordinance. If the retained workers were already represented by a union, there would be no occasion for an immediate organizing drive, while if they were not, a union could mount the very same organizing drive absent the Ordinance and would be as likely to file the very same unfair labor practice charge if the response was to dismiss employees en masse.

We are not the first court to consider these questions. The City is not unique in California in enacting a worker retention ordinance, nor is California alone in having its municipalities do so.[19] A small but growing number of federal courts have considered the argument that such ordinances are preempted under *Machinists* (see *Machinists*, *supra*, 427 U.S. 132); to a one, they have concluded, as we do, that neither indirect effects on successorship nor any other aspect of the ordinances gives rise to preemption. (See *Wash. Serv. Contractors v. Dist. of Columbia*, *supra*, 54 F.3d at pp. 817-818 [D.C. retention ordinance does not "disturb[] the process established by the NLRA for resolving labor disputes" and is permissible "substantive employee protective legislation having nothing to do with rights to organize or bargain collectively"]; *Rhode Island Hospitality Assn. v.*

<hr />

*(footnote continued from previous page)*

"safeguard[s] the right of employees to self-organization and to select representatives of their own choosing for collective bargaining or other mutual protection without restraint or coercion by their employer."].) Whether its employees prefer representation is, as a purely legal matter, of no moment to an employer, and whatever its employees choose, an employer under the NLRA is bound to respect. (See 29 U.S.C. §§ 158(a)(2), (5).)

[19]     See *ante*, footnote 1.

*City of Providence*, *supra*, __ F.Supp.2d at p. ___ [2011 U.S. Dist. Lexis 34821, at p. *42] [Providence retention ordinance "is primarily designed to provide temporary job protection to both unionized and nonunionized employees[,] which does not constitute a significant intrusion into the equitable collective bargaining process established by the NLRA"]; *Alcantara v. Allied Properties, LLC* (E.D.N.Y. 2004) 334 F.Supp.2d 336, 345 [N.Y.C. retention ordinance "does not conflict with or inhibit the bargaining or dispute resolution process established by the NLRA," nor does it "regulate economic self-help activities"].) We join the developing consensus.

We close with an observation concerning our role. "In labor pre-emption cases . . . our office is not to pass judgment on the reasonableness of state [or local] policy . . . ." (*Livadas v. Bradshaw*, *supra*, 512 U.S. at p. 120.) When evaluating claims of NLRA preemption, we may not substitute our own views of sound economic policy for those of the elected branches. (See *St. Thomas-St. John Hotel v. Govern. of U.S. VI*, *supra*, 218 F.3d at p. 246 [rejecting the "unsettling supposition" that courts should use preemption to strike down local hiring and firing laws as impermissible intrusions into "an area that has traditionally been left to the freedom of contract between an employer and an employee"].) Rather, we inquire solely into whether the challenged regulation is one Congress sought to preclude; if the text and structure of the NLRA demonstrate an affirmative intent to leave the subject matter of the Ordinance untouched by state and local regulation, only then may we find it preempted. Having found no such indication, we conclude the presumption against preemption has not been rebutted and *Machinists* does not apply.

### III. *Equal Protection*

As an alternate basis for affirmance, Grocers contend the Ordinance violates the equal protection clauses of both the state and federal Constitutions.

(U.S. Const., 14th Amend.; Cal. Const., art. I, § 7(a).)  We consider the question de novo.  (E.g., *Garcia v. Four Points Sheraton LAX* (2010) 188 Cal.App.4th 364, 381.)  We conclude the Ordinance is constitutional.

### A.  *Constitutional Principles*

As the trial court concluded, and as all parties agree, because the Ordinance involves neither suspect classifications nor fundamental rights or interests it is subject only to "rational basis" or "rational relationship" review.  (See *Hernandez v. City of Hanford* (2007) 41 Cal.4th 279, 299.)  " '[I]n areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge *if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.*' "  (*Warden v. State Bar* (1999) 21 Cal.4th 628, 644, quoting *FCC v. Beach Communications, Inc.* (1993) 508 U.S. 307, 313 (italics added by *Warden*).)  So long as the challenged distinction "bear[s] some rational relationship to a conceivable legitimate state purpose" (*Westbrook v. Mihaly* (1970) 2 Cal.3d 765, 784; accord, *Hernandez*, at p. 299; *Warden*, at p. 641), it will pass muster; once we identify " ' "plausible reasons" for [the classification] "our inquiry is at an end" ' " (*Warden*, at p. 644, quoting *FCC v. Beach Communications, Inc.*, at p. 313).  Of significance to our inquiry, "because we never require a legislature to articulate its reasons for enacting a statute, it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature."  (*FCC v. Beach Communications, Inc.*, at p. 315.)  The burden is on Grocers, as the party challenging the Ordinance, to negate any such rational basis or relationship to a conceivable legitimate purpose.  (*FCC v. Beach Communications, Inc.*, at p. 315; *Hernandez*, at p. 299.)

34

B. *Application*

Subject to a union's and employer's ability to opt out through collective bargaining (L.A. Mun. Code, § 181.06), the Ordinance applies to retail stores over 15,000 square feet in size that primarily sell household food for offsite consumption—in other words, large grocery stores (*id.*, § 181.01(E); see also *id.*, § 12.24(U)(14)(a) [excluding membership stores]). Grocers take issue with four distinctions implicit in this scope: (1) between nonmember grocery stores and membership stores; (2) between grocery stores more than and less than 15,000 square feet in size; (3) between grocery stores and restaurants; and (4) between grocery stores where a unionized workforce has agreed to different terms and those where it has not.

In evaluating the City's determination of the scope of the Ordinance, we are mindful that the decision how broadly and in what manner to attack perceived problems is for the elected branches in the first instance. Past decisions by both this court and the United States Supreme Court "establish that, under the rational relationship test, the state may recognize that different categories or classes of persons within a larger classification may pose varying degrees of risk of harm, and properly may limit a regulation to those classes of persons as to whom the need for regulation is thought to be more crucial or imperative." (*Warden v. State Bar*, *supra*, 21 Cal.4th at p. 644, citing *American Bank & Trust Co. v. Community Hospital* (1984) 36 Cal.3d 359, 371, and *Williamson v. Lee Optical Co.* (1955) 348 U.S. 483, 489.) "Evils in the same field may be of different dimensions and proportions, requiring different remedies. Or so the legislature may think. [Citation.] Or the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind." (*Williamson*, at p. 489.) Such line-drawing is the province of legislative bodies, and "the precise coordinates of the resulting legislative judgment [are] virtually

35

unreviewable, since the legislature must be allowed leeway to approach a perceived problem incrementally." (*FCC v. Beach Communications, Inc.*, *supra*, 508 U.S. at p. 316.)

Here, the City elected to impose temporary job retention requirements on large grocery stores, but not on, e.g., restaurants or membership clubs that also sell food. (See L.A. Mun. Code, §§ 12.24(U)(14)(a), 181.01(E).) The City believed supermarkets function as community anchors, a judgment it is not our role to question. (See *id.*, § 181.00 ["Supermarkets and other grocery retailers are the main points of distribution for food and daily necessities for the residents of Los Angeles and are essential to the vitality of any community."].) Given their perceived significance, the City rationally could conclude it was more important to ensure stability and continuity at such entities than at restaurants or members-only stores that arguably do not serve a similarly crucial function. The trial court correctly rejected Grocers' equal protection argument on these grounds.

As to the constitutionality of the Ordinance's size distinction, the Ordinance on its face has as one of its purposes the promotion of job security and the minimization of community disruption that arises from job losses and changes. (See L.A. Mun. Code, § 181.00 ["Through this ordinance, the City seeks to sustain the stability of a workforce that forms the cornerstones of communities in Los Angeles."].) The City rationally could conclude both that disruptions at larger stores, involving larger workforces, would have a larger impact on the community, and that larger stores would be more readily positioned to absorb any short-term burdens the Ordinance's requirements might impose on employers. (See *Garcia v. Four Points Sheraton LAX*, *supra*, 188 Cal.App.4th at p. 384 [upholding size classification as rationally related to a business's ability to bear regulatory burdens].) Both Congress and the state Legislature frequently, and constitutionally, have incorporated exceptions for smaller employers when

36

regulating the employment relationship. (See, e.g., 42 U.S.C. § 2000e(b) [tit. VII small-employer exception]; Gov. Code, § 12926, subd. (d) [Cal. Fair Employment & Housing Act small-employer exception].) So long as we can identify a rational relationship between a classification and at least one legitimate purpose of an enactment, the classification will pass constitutional muster. (See *Hernandez v. City of Hanford*, *supra*, 41 Cal.4th at pp. 299-302 [rejecting an equal protection challenge to a store size classification because size was rationally related to community impact].)

Finally, concerning the Ordinance's opt-out provision (L.A. Mun. Code, § 181.06), the United States Supreme Court has made clear that affording employers and unions the right to opt out and negotiate their own terms increases the likelihood a given regulation will be found not preempted by the NLRA. (*Fort Halifax*, *supra*, 482 U.S. at p. 22.) An opt-out provision thus is rationally related to the desire to enact valid (nonpreempted) legislation, as well as to the legitimate goal of "balanc[ing] the desirability of a particular substantive labor standard against the right of self-determination regarding the terms and conditions of employment." (*Ibid.*; see also *Viceroy Gold Corp. v. Aubry* (9th Cir. 1996) 75 F.3d 482, 490-491 [upholding labor protections subject to a collective bargaining opt-out provision because the Legislature rationally could have believed unionized workers are competent to negotiate their own protections]; *Garcia v. Four Points Sheraton LAX*, *supra*, 188 Cal.App.4th at pp. 385-386 [applying *Viceroy*'s rationale to uphold an L.A. Mun. Code collective bargaining opt-out provision identical to the one at issue here].)

37

## DISPOSITION

For the foregoing reasons, we reverse the Court of Appeal's judgment and remand this case for further proceedings consistent with this opinion.

**WERDEGAR, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**KENNARD, J.**
**BAXTER, J.**
**CHIN, J.**
**CORRIGAN, J.**

## DISSENTING OPINION BY GRIMES, J.

I respectfully dissent, finding City of Los Angeles Ordinance No. 177,231 is preempted by the National Labor Relations Act (NLRA) (29 U.S.C. § 151 et seq.).

In my view, the ordinance intrudes on the collective bargaining process in an extraordinary and fundamental way, at its very source. It determines the individual workers who will comprise a new employer's work force for the first 90 days of its operation. During those 90 days, the new employer must provide employment to a group of workers it did not choose. In addition, the new employer must provide to this mandated work force specified benefits (such as termination for cause only) for which the workers did not bargain and to which the new employer did not agree. I recognize that governments, including states and municipalities, have the authority to impose minimum employment standards of general application – including restrictions on hiring and firing. Consequently, an employer has no absolute right to choose its employees by, for example, discriminating on the basis of some group characteristic or union membership. But federal labor law does not permit a government mandate that an employer hire either a particular worker or a specific group of workers based on a group characteristic (or on anything else). That fundamental choice is left under federal law to the employer and employee, that is, to the free play of economic forces. This has been clear since the Supreme Court first upheld the constitutionality of the NLRA in *Labor Board v. Jones & Laughlin* (1937) 301 U.S. 1, 45 (*Jones &*

1

*Laughlin*), when the high court said that the NLRA "does not interfere with the normal exercise of the right of the employer to select its employees or to discharge them."

The point – that the NLRA does not interfere with an employer's selection of its work force – has been reiterated many times by the high court: in *NLRB v. Burns Security Services* (1972) 406 U.S. 272, 294 (*Burns*) [an employer "is ordinarily free to set initial terms on which it will hire the employees of a predecessor"]; in *Howard Johnson Co. v. Hotel Employees* (1974) 417 U.S. 249, 262 (*Howard Johnson*) ["Clearly, *Burns* establishes that [the new employer] had the right not to hire any of the former [employer's] employees, if it so desired"]; and in *Fall River Dyeing & Finishing Corp. v. NLRB* (1987) 482 U.S. 27, 40 (*Fall River Dyeing*) ["[w]e further explained [in *Burns*] that the successor is under no obligation to hire the employees of its predecessor . . ."].

The majority says these high court precedents establish only a principle of federal common law, and have no bearing on the authority of state and local governments to require the hiring for 90 days of a particular bloc of workers. With this I cannot agree. Under the preemption doctrine established in *Machinists v. Wisconsin Emp. Rel. Comm'n* (1976) 427 U.S. 132 (*Machinists*) and its progeny, the salient inquiry is "whether Congress intended that the conduct involved be unregulated because left 'to be controlled by the free play of economic forces.'" (*Id.* at p. 140.) The implicit right of the employer to select its employees in the first instance – recognized by the high court since 1937 – is, it seems to me, as fundamental to the structure of the NLRA as is the correlative express right of those selected employees to organize to secure the redress of grievances and to promote agreements with the employer on working conditions. (See *Jones & Laughlin*, *supra*, 301 U.S. at pp. 43-44.) State or municipal regulation that directly interferes with that right is preempted by the NLRA under *Machinists* doctrine as surely as is regulation that is directed at the collective bargaining process itself. And, even if we ignore the employer's right to select its

2

work force as a fundamental premise of the NLRA, the impact of the ordinance on the determination whether the new employer is a successor – and thus bound to bargain with the union selected by the predecessor's employees – likewise is an unpermitted intrusion on the collective bargaining process.

## 1.    The ordinance

The City of Los Angeles (City) adopted the Grocery Worker Retention Ordinance in 2005.  (L.A. Ord. No. 177,231, adding ch. XVIII, § 181.00 et seq. to L.A. Mun. Code.)  The ordinance is described fully in the majority opinion.  In brief, it applies to grocery stores exceeding a specified size that undergo a change of ownership.  It gives nonmanagerial employees of the former owner who have worked for that owner for at least six months the right to demand employment by the new owner:  the new employer must select its employees from among that group, by seniority, and must retain them for 90 days, discharging them only for cause.  After 90 days, the new employer must prepare a written performance evaluation for each such employee and consider offering continued employment to those with satisfactory evaluations.  As the majority notes, other municipalities in California and elsewhere have adopted similar ordinances.

## 2.    The NLRA

The NLRA "is a comprehensive code passed by Congress to regulate labor relations in activities affecting interstate and foreign commerce.  As such it is of course the law of the land which no state law can modify or repeal."  (*Nash v. Florida Industrial Commission* (1967) 389 U.S. 235, 238.)  The NLRA declares the policy of the United States:  "to eliminate . . . obstructions to the free flow of commerce . . . by encouraging the practice and procedure of collective bargaining and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection." (29 U.S.C. § 151.)

3

The need for the NLRA flowed from a free market economy in which equality of bargaining power did not exist. Employers were (and are) "organized in the corporate or other forms of ownership association" and employees "[did] not possess full freedom of association or actual liberty of contract . . . ." (29 U.S.C. § 151.) Congress found it unnecessary to say in the NLRA that the composition of an employer's work force is a matter of the employer's choice, but in our country, hiring has always occurred on an individual basis, one employee at a time: the employer advertises, prospective workers apply, and the employer selects.

The Supreme Court recognized this underlying premise of the NLRA almost immediately, when it said in 1937 that the NLRA "does not prevent the employer 'from refusing to make a collective contract and hiring individuals on whatever terms' the employer 'may by unilateral action determine.'" (*Jones & Laughlin*, *supra*, 301 U.S. at p. 45.) The NLRA prohibits specified unfair labor practices by employers and unions (29 U.S.C. § 158) and empowers the National Labor Relations Board (NLRB) to prevent anyone from engaging in those unfair labor practices. (29 U.S.C. § 160.) The point of the NLRA was to "restor[e] equality of bargaining power between employers and employees" (29 U.S.C. § 151) by requiring an employer to bargain with "representatives of [the workers'] own choosing" (*ibid.*) – and *not* to "interfere with the normal exercise of the right of the employer to select its employees or to discharge them." (*Jones & Laughlin*, *supra*, 301 U.S. at p. 45.)

Thus, the very foundation of the NLRA lies in a workplace composed of individuals selected by the employer. The NLRA protects the rights of those individuals whom the employer has chosen to hire, to associate with each other, to organize themselves, and to designate representatives of *their* choosing to negotiate the terms and conditions of their employment. (29 U.S.C. § 151.) If the workers vote to select a union to represent them, the employer must negotiate with the union in a good faith effort to reach agreement on wages, hours and other

4

terms of employment.  The NLRA does not mandate that the parties reach agreement, only that they try to agree.  If they cannot agree, the NLRA establishes the rules of the battleground, protecting certain pressure tactics and prohibiting others, to keep the process fair.

The NLRA specifies the single circumstance under which the NLRB may interfere with the employer's selection of its workers:  the employer cannot hire or fire based on union membership.  The NLRA specifies that an employer commits an unfair labor practice "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . ."  (29 U.S.C. § 158 (a)(3).)  *Jones & Laughlin*, after stating that the NLRA does not interfere with the employer's right to select or discharge its employees, tells us that "[t]he employer may not, under cover of that right, intimidate or coerce its employees with respect to their self-organization and representation, and, on the other hand, the Board is not entitled to make its authority a pretext for interference with the right of discharge when that right is exercised for other reasons than such intimidation and coercion."  (*Jones & Laughlin*, *supra*, 301 U.S. at pp. 45-46.)  Twelve years after deciding *Jones & Laughlin*, the high court announced the corollary principle that states may prohibit discrimination in hiring and firing against *non*-union workers.  (*Lincoln Union v. Northwestern Co.* (1949) 335 U.S. 525, 537 ["Just as we have held that the due process clause erects no obstacle to block legislative protection of union members, we now hold that legislative protection can be afforded non-union workers."].)

The majority is mistaken in saying I have expressed here the view that the NLRA was founded on an employer's absolute right to select its employees. Plainly, the NLRA was not founded on an employer's liberty to discriminate against either union or non-union members because they are such.  In my view, regulations prohibiting unlawful discrimination and imposing minimum employment standards in no way undermine the foundation of the NLRA that each

workplace may be composed of individuals selected by the employer for reasons other than discrimination.

The NLRA does not transform the fundamentally individual nature of the employment relationship. Its focus is on the right of individual workers to band together, if they so choose, and to select representatives of their own choosing, to bargain with the employer who has hired them. This is the base upon which the NLRA is constructed and from which all of its provisions flow. Just as *Jones & Laughlin* made it clear that Congress did not intend in the NLRA to change the fundamental, individual nature of the employer-employee relationship, including "the right of the employer to select its employees" (*Jones & Laughlin*, *supra*, 301 U.S. at p. 45), I conclude it necessarily follows that Congress did not intend to allow any other governmental entity to do so either. To permit a city to mandate that a new employer hire the predecessor's employees as a group violates the fundamental structure of the NLRA and necessarily hands weapons of economic power to a group the employer did not choose to hire. It is preempted under the doctrine established in *Machinists* and its progeny, to which I now turn.

**3.      *Machinists* preemption**

*Machinists* examined the history of labor law preemption under the NLRA and identified two lines of preemption analysis. The first is based on the primary jurisdiction of the NLRB to regulate conduct that is a protected right under section 7 (29 U.S.C. § 157) or conduct that is an unfair labor practice in violation of section 8 of the NLRA (29 U.S.C. § 158). State regulation of conduct that is protected under section 7 or an unfair labor practice under section 8 is preempted under what is now called *Garmon* preemption. (*San Diego Unions v. Garmon* (1959) 359 U.S. 236, 244.) Because the City's ordinance does not "'regulate activity that the NLRA protects, prohibits, or arguably protects or prohibits'" (*Chamber of Commerce of United States v. Brown* (2008) 554 U.S. 60, 65 (*Brown*)) under sections 7 and 8, there is no *Garmon* preemption.

But *Machinists* recognized "a second line of pre-emption analysis . . . developed in cases focusing upon the crucial inquiry whether Congress intended that the conduct involved be unregulated because left 'to be controlled by the free play of economic forces.'" (*Machinists*, *supra*, 427 U.S. at p. 140.) As *Brown* put it, *Machinists* preemption forbids both the NLRB and states from regulating conduct Congress intended be unregulated: "*Machinists* pre-emption is based on the premise that "'Congress struck a balance of protection, prohibition, and laissez-faire in respect to union organization, collective bargaining, and labor disputes.""" (*Brown*, *supra*, 554 U.S. at p. 65; see *id*. p. 66 [holding statutes preempted under *Machinists* "because they regulate within 'a zone protected and reserved for market freedom'"].)

Under *Machinists*, "congressional intent to shield a zone of activity from regulation is usually found only 'implicit[ly] in the structure of the Act,' [citation], drawing on the notion that "'[w]hat Congress left unregulated is as important as the regulations that it imposed,'" [citation]." (*Brown*, *supra*, 554 U.S. at p. 68.) This is just such a case. An employer's right to select the members of the work force with whose representatives it will be required to bargain, if they so choose, is the foundation on which the NLRA was built, unstated but implicit in its structure. This is a paradigm of the principle that what Congress left unregulated is fully as important as the regulations it imposed. In my view, this alone is reason enough to conclude the City's ordinance, which stands in direct contradiction to one of the building blocks of the NLRA, cannot stand.

*Machinists* arose from the collective bargaining process itself and the pressure tactics employed by both sides during that process. In *Machinists*, the court found the state could not enjoin a union and its members from refusing to work overtime as part of a union effort to put economic pressure on the employer during contract negotiations. (*Machinists*, *supra*, 427 U.S. at p. 133.) The court observed that many of its past decisions concerning conduct "left by Congress to the free play of economic forces" (*id*. at p. 147) involved union and employee

7

activities, but that "self-help is of course also the prerogative of the employer because he, too, may properly employ economic weapons Congress meant to be unregulable." (*Ibid.*) Thus, "'[r]esort to economic weapons'" was the right of both employer and employee, "and the State may not prohibit the use of such weapons or 'add to an employer's federal legal obligations in collective bargaining' any more than in the case of employees." (*Ibid.*) So, "[w]hether self-help economic activities are employed by employer or union, the crucial inquiry regarding pre-emption is the same: whether 'the exercise of plenary state authority to curtail or entirely prohibit self-help would frustrate effective implementation of the Act's processes.'" (*Id.* at pp. 147-148.) Congress meant that these activities "were not to be regulable by States any more than by the NLRB" (*id*. at p. 149), and sanctioning state regulation of economic pressure "deemed by the federal Act 'desirabl[y] . . . left for the free play of contending economic forces'" amounts to "'denying one party to an economic contest a weapon that Congress meant him to have available.'" (*Id.* at p. 150.) *Machinists* concluded that such regulation by the state was "impermissible because it '"stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."'" (*Id.* at p. 151.)

The majority concludes from *Machinists* and subsequent cases that the areas Congress intended to leave free of local regulation are confined to those relating to the *process* by which an agreement is reached on the terms of employment and not on the *substance* of those terms. Certainly, it is true that the NLRA is not concerned with the substance of the parties' agreement, and cases since *Machinists* have made it clear that state or federal regulations establishing minimum terms of employment that protect union and nonunion workers alike "'neither encourage[] nor discourage[] the collective-bargaining processes that are the subject of the NLRA'" and are not preempted. (*Fort Halifax Packing Co. v. Coyne* (1987) 482 U.S. 1, 21 (*Fort Halifax*) [Me. statute requiring employers to provide a one-time severance payment to employees in the event of a plant closing

8

was not preempted; "establishment of a minimum labor standard does not impermissibly intrude upon the collective-bargaining process" (*id*. at p. 23)]; see also *Metropolitan Life Ins. Co*. v. *Massachusetts* (1985) 471 U.S. 724, 757 (*Metropolitan Life*) ["[w]hen a state law establishes a minimal employment standard not inconsistent with the general legislative goals of the NLRA, it conflicts with none of the purposes of the Act"; state law requiring that minimum mental health benefits be provided under certain insurance policies was not preempted (*id*. at p. 758)].)

But in my view, the ordinance profoundly interferes with the *collective bargaining process*. We are not here concerned with local regulation "establishing minimum terms of employment." (*Metropolitan Life*, *supra*, 471 U.S. at p. 754.) Nor are we concerned with state regulations "prescribing the minimum wages, maximum hours, and standard conditions of employment . . . ." (*Industrial Welfare Com. v. Superior Court* (1980) 27 Cal.3d 690, 698.) The ordinance does not merely impose a term or condition of employment, in the sense of requiring mental health insurance coverage as in *Metropolitan Life*, or a severance payment in the event of a plant closing as in *Fort Halifax*, or minimum wages and maximum hours as in *Industrial Welfare Com.*—benefits that apply across the board to every individual employee among the employer's selected work force.

We are concerned with a local regulation that *creates employment* by dictating which individuals the new grocery owner must hire, and *then* establishes minimum standards for those workers. It is the initial requirement to hire, not the minimum standards applied to those hired, that causes the ordinance to be preempted under *Machinists*. The requirement to hire, of course, is not a part of the collective bargaining process at all. But it necessarily subverts that process, because it determines the members of the work force who will decide the matters of "self-organization and collective bargaining" (*Metropolitan Life*, *supra*, 471 U.S. at p. 751) that are concededly the exclusive province of the NLRA.

As the majority points out, the ordinance does not, on its face, regulate organizing or bargaining.  But the ordinance does indeed regulate the economic contest, in at least two basic ways.  (See *Machinists*, *supra*, 427 U.S. at p. 150 [state regulation of economic pressure, deemed by the NLRA to be left to the free play of contending economic forces, is "'denying one party to an economic contest a weapon that Congress meant him to have available'"].)

First, the fact that the employer's choice of employees who will comprise its work force necessarily precedes any """"union organization, collective bargaining, and labor disputes""""" (*Brown*, *supra*, 554 U.S. at p. 65) does not reduce the significance of that choice to the regulatory scheme Congress fashioned in the NLRA, which was created to provide "a framework for self-organization and collective bargaining." (*Metropolitan Life*, *supra*, 471 U.S. at p. 751.)  The people who comprise the work force are an integral part of that framework, and the employer's right to select its employees, one by one, was left undisturbed in the NLRA, as *Jones & Laughlin* explicitly tells us.  So, I cannot accept the notion that states are left free to do what the NLRA does not do simply because the conduct in question – hiring the employees who will launch the new employer's grand opening – precedes the collective bargaining process.

Second, while the City's ordinance is not expressly aimed at the collective bargaining process, I think it is fair to say that the ordinance itself is an economic weapon—not a weapon wielded by either of the parties to a labor dispute, but one superimposed by the City that necessarily "'upset[s] the balance that Congress has struck between labor and management in the collective-bargaining relationship.'" (*Metropolitan Life*, *supra*, 471 U.S. at p. 751.)  An ordinance that dictates whom a new employer must hire denies that new employer the ability to choose the employees it deems most suited to ensuring the success of its enterprise, and does so during the critical first 90 days of its operation.  This is a matter of considerable moment to new owners with their own management styles, the implementation of which depends on selecting employees one by one.

10

The trial testimony demonstrates this point, showing that the first 90 days of a new grocery owner's operation are the most important to establish the new owner's image and to "deliver" to new customers. One witness said, "The supermarket business is a very competitive business, and if you don't deliver to the customers in the first 90 days, you've probably lost them." Another witness testified it was critical to his company, when acquiring a new store, to bring in experienced personnel from the grocer's other stores who understand the company's business philosophy. The company tries to hire from the community (and if a predecessor's employee were the right fit for the company, it would hire him or her to work in one of its other stores), but the company had significant concerns about retaining a bloc of employees without the option "to determine whether they would fit, have the work ethic, the work history that would fit our organizational style as a collective group"; "we would have more difficult[y] running that store from day one in the style and fashion that we require . . . ." One witness indicated his company's need to "hire our own crew" because the company wanted bilingual employees to fully serve the shoppers to which it catered. In short, new owners of previously faltering grocery stores have sound reasons for the "normal exercise" of their right under federal law to select their own work forces. (*Jones & Laughlin*, *supra*, 301 U.S. at p. 45.) The ordinance, stripping away the new employer's choices in hiring during the critical first 90 days, operates as an economic weapon and directly affects the economic activities of the employer. To say that it is not a form of economic pressure that alters the collective bargaining relationship is, in my view, fundamentally erroneous.

The economic pressure is not imposed by the employees as union members during collective bargaining, but it is government-imposed on their behalf during a time when they are free to engage in the process of self-organization governed by the NLRA. The ordinance mandates which individuals are to comprise the work force that will decide how or whether to bargain with the employer. To deny that an economic weapon is in play between contending economic forces as a result of

11

the ordinance is to ignore the fundamental relationship between labor and management upon which the NLRA is constructed. The requirement to hire a specific bloc of employees, it seems to me, necessarily "has altered the economic balance between labor and management." (*New York Tel. Co. v. New York Labor Dept.* (1979) 440 U.S. 519, 532; see also *Burns*, *supra*, 406 U.S. at p. 288 ["The congressional policy manifest in the Act is to enable the parties to negotiate for any protection either deems appropriate, but to allow the balance of bargaining advantage to be set by economic power realities."].) Work force selection is perforce one of the most basic "economic power realities."

The majority's view is that the ordinance is of a piece with other state and local regulations broadly regulating hiring and firing, and that it does not regulate bargaining or speak directly to the process of organizing; instead the ordinance temporarily preserves the status quo, whatever that may be (whether the work force is unionized or not). (Maj. opn. *ante*, at pp. 19-21.) But the flaw in the City's ordinance lies in the mandated selection of an employer's work force in the first instance, a sui generis form of regulation. And, in my view, the temporary nature of the ordinance is entirely irrelevant; either Congress intended that the employer's right to select its work force be unregulated, or it did not; I do not see how there can be any middle ground on congressional intent. (See *Metropolitan Life*, *supra*, 471 U.S. at p. 749 [the "second [*Machinists*] pre-emption doctrine protects against state interference with policies implicated by the structure of the Act itself, by pre-empting state law . . . concerning conduct that Congress intended to be unregulated"; while "[a]n appreciation of the State's interest in regulating a certain kind of conduct may still be relevant in determining whether Congress in fact intended the conduct to be unregulated" (*id*. at pp. 749-750, fn. 27), such preemption "*does not involve in the first instance a balancing of state and federal interests, . . . but an analysis of the structure of the federal labor law* to determine whether certain conduct was meant to be unregulated" (*ibid*., italics added)].)

12

In the end, the majority frames the question as whether there is evidence that Congress affirmatively intended to leave the subject of employee "retention" during ownership transitions unregulated by states and municipalities, and finds the NLRA "resoundingly silent." (Maj. opn. *ante*, at p. 18.) In my view, this misstates the question, which is whether Congress intended to leave unregulated the employer's initial selection – not the retention – of its work force. And the NLRA is indeed silent on both questions; there is nothing in the text of the NLRA about hiring or firing (except to prohibit doing either based on union affiliation). But the silence is hardly surprising; the high court has told us that congressional intent to shield a zone of activity from regulation in *most* cases is found "only 'implicit[ly] in the structure of the Act'" (*Brown*, *supra*, 554 U.S. at p. 68), not in its text. The NLRA was founded on, and everything in it assumes, the existence of a freely formed employer-employee relationship. (*Jones & Laughlin*, *supra*, 301 U.S. at p. 45.) It would be anomalous to conclude that, despite this foundation, Congress did not intend to prevent states and localities from doing the very thing that it declined to do: interfere with an employer's selection of the people who will conduct its business.

For the foregoing reasons alone, I would find the City's ordinance preempted. But there is more, because the ordinance *does* have a direct impact on the collective bargaining *process*. The ordinance's requirement that the new owner hire the predecessor's work force necessarily influences whether or not the new employer will be considered a successor to the former employer, and thus bound to bargain with the union selected by the predecessor's employees – a direct intrusion on the collective bargaining process.

**4.     The successorship doctrine**

If a new employer is deemed a successor of the old employer and hires a majority of its employees from the predecessor's work force, the new employer has a duty to recognize and bargain with the union representing the predecessor's employees. This "successorship doctrine" developed through several high court

13

cases.  The first of these, *John Wiley & Sons v. Livingston* (1964) 376 U.S. 543 (*John Wiley*), involved the disappearance by merger of a corporate employer and the wholesale transfer of its employees to the company into which the corporate employer merged.  The union representing the predecessor's employees asserted that the new employer (Wiley) was obligated to recognize certain rights of the employees under its collective bargaining agreement with Wiley's predecessor; Wiley asserted the merger terminated the collective bargaining agreement for all purposes; and the union sought to compel arbitration.  (*Id.* at pp. 545-546.)

The high court first observed that "[f]ederal law, fashioned 'from the policy of our national labor laws,' controls." (*John Wiley*, *supra*, 376 U.S. at p. 548.)  It then held that the disappearance by merger of a corporate employer that had entered into a collective bargaining agreement did not automatically terminate all rights of the employees covered by the agreement, and that, "in appropriate circumstances, present here, the successor employer may be required to arbitrate with the union under the agreement." (*Ibid.*)  The court elaborated:  "The objectives of national labor policy, reflected in established principles of federal law, require that the rightful prerogative of owners independently to rearrange their businesses and even eliminate themselves as employers be balanced by some protection to the employees from a sudden change in the employment relationship. The transition from one corporate organization to another will in most cases be eased and industrial strife avoided if employees' claims continue to be resolved by arbitration rather than by 'the relative strength . . . of the contending forces,' [citation]." (*Id.* at p. 549.)

The court found Wiley's obligation to arbitrate the dispute "in the [predecessor's] contract construed in the context of a national labor policy." (*John Wiley*, *supra*, 376 U.S. at pp. 550-551; see *id.* at p. 550 ["the impressive policy considerations favoring arbitration are not wholly overborne by the fact that Wiley did not sign the contract being construed"].)  But the court cautioned:  "We do not hold that in every case in which the ownership or corporate structure of an

14

enterprise is changed the duty to arbitrate survives. . . . . [T]here may be cases in which the lack of any substantial continuity of identity in the business enterprise before and after a change would make a duty to arbitrate something imposed from without, not reasonably to be found in the particular bargaining agreement and the acts of the parties involved." (*Id.* at p. 551.) In *John Wiley*, the required "similarity and continuity of operation across the change in ownership [was] adequately evidenced by the wholesale transfer of [the predecessor's] employees to the Wiley plant . . . . (*Ibid.*)

Next, the high court decided *Burns*, *supra*, 406 U.S. 272, holding that an employer that hired a majority of its predecessor's employees had an obligation to bargain with the union that represented those employees, but could not be required to observe the terms of the union's collective bargaining agreement with the predecessor. (*Id.* at pp. 278, 286-287.) In *Burns* there was no relationship between the new employer and its predecessor. The new employer replaced the predecessor when it bid for and obtained a service contract to provide plant protection services. (*Id.* at pp. 274-275.) The new employer's obligation to bargain with the union "stemmed from its hiring of [the former employer's] employees and from the recent election and Board certification." (*Id.* at pp. 278-279.) "[I]t would be different if Burns had not hired employees already represented by a union certified as a bargaining agent . . . ." (*Id.* at p. 280.)

The *Burns* court noted that the NLRB "has never held that the National Labor Relations Act itself requires that an employer who submits the winning bid for a service contract or who purchases the assets of a business be obligated to hire all of the employees of the predecessor though it is possible that such an obligation might be assumed by the employer." (*Burns*, *supra*, 406 U.S. at p. 280, fn. 5.) But while the new employer had a duty to bargain, it could not be required to honor the terms of the previous employer's collective bargaining agreement. "The source of its duty to bargain with the union is not the collective-bargaining contract but the fact that it voluntarily took over a bargaining unit that was largely

15

intact and that had been certified within the past year.  Nothing in its actions, however, indicated that Burns was assuming the obligations of the contract, and 'allowing the Board to compel agreement when the parties themselves are unable to agree would violate the fundamental premise on which the Act is based – private bargaining under governmental supervision of the procedure alone, without any official compulsion over the actual terms of the contract.'"  (*Id.* at p. 287.)  And, *Burns* said, a successor employer "is ordinarily free to set initial terms on which it will hire the employees of a predecessor . . . ."  (*Id.* at p. 294.)

Then came *Howard Johnson*, *supra*, 417 U.S. 249, where the court held that the new employer, who hired only a small fraction of the predecessors' employees, could *not* be compelled to arbitrate*,* under its predecessors' collective bargaining agreements, the extent of its obligations under those agreements to the predecessors' employees.  (*Id.* at pp. 250, 264.)  In *Howard Johnson*, the new employer leased restaurant and motor lodge premises from the old employer, and purchased all the personal property used in their operations.  (*Id.* at p. 251.)  The seller notified its employees their employment would terminate when operations were transferred.  Upon the sale, the new employer began operations with 45 employees, only nine of whom had been employed by the seller, and the union sued, seeking arbitration, which the trial court granted under *John Wiley*.  (*Howard Johnson*, at pp. 252-253.)

The high court held that *Burns* principles applied.  The court acknowledged some inconsistencies in reasoning between *John Wiley* and *Burns*, but found it unnecessary to decide whether an irreconcilable conflict existed, because the facts in *John Wiley* were entirely different from those before the court in *Howard Johnson.*  (*Howard Johnson*, *supra*, 417 U.S. at pp. 255-256.)  In addition to the fact (among others) that the seller remained a viable entity after the asset sale, "[e]ven more important, in *Wiley* the surviving corporation hired *all* of the employees of the disappearing corporation," making no substantial changes in the operation of the business.  (*Howard Johnson*, at p. 258.)  "It was on this basis that

16

the Court in *Wiley* found that there was the 'substantial continuity of identity in the business enterprise,' [citation], which it held necessary before the successor employer could be compelled to arbitrate." (*Howard Johnson*, at p. 259.)

By contrast, the new employer in *Howard Johnson* "decided to select and hire its own independent work force . . . ." (*Howard Johnson*, *supra*, 417 U.S. at p. 259.) The union's position was that the new employer was bound by the seller's collective bargaining agreement to hire all of the seller's former employees. (*Id.* at p. 260.) This position, the high court said, was "completely at odds with the basic principles this Court elaborated in *Burns.*" (*Id.* at p. 261.) The court said: "Clearly, *Burns* establishes that Howard Johnson had the right not to hire any of the former [employer's] employees, if it so desired." (*Id.* at p. 262.) The continuity of identity in the business enterprise that *John Wiley* required "necessarily includes, we think, a substantial continuity in the identity of the work force across the change in ownership." (*Howard Johnson*, at p. 263.)

Moreover: "This interpretation of *Wiley* is consistent also with the Court's concern with affording protection *to those employees who are in fact retained* in '[t]he transition from one corporate organization to another' from sudden changes in the terms and conditions of their employment . . . . *At the same time, it recognizes that the employees of the terminating employer have no legal right to continued employment with the new employer* . . . . This holding is compelled, in our view, if the protection afforded employee interests in a change of ownership by *Wiley* is to be reconciled with the new employer's right to operate the enterprise with his own independent labor force." (*Howard Johnson*, *supra*, 417 U.S. at p. 264, italics added.)

Finally, there was *Fall River Dyeing,* where the court held that a successor's obligation to bargain was not limited to a situation where (as in *Burns*) the union had recently been certified; instead, where a union has a rebuttable presumption of majority status, that status continues through a change in employers if "the new employer is in fact a successor of the old employer *and* the

17

majority of its employees were employed by its predecessor." (*Fall River Dyeing*, *supra*, 482 U.S. at p. 41, italics added.) *Fall River Dyeing* repeated the principles established in *Burns*: "We further explained that the successor is under no obligation to hire the employees of its predecessor . . . . If the new employer makes a conscious decision to maintain generally the same business and to hire a majority of its employees from the predecessor, then the bargaining obligation of § 8(a)(5) is activated. This makes sense when one considers that the employer *intends* to take advantage of the trained work force of its predecessor." (*Fall River Dyeing*, at pp. 40-41, citations omitted.) Thus "[t]he 'triggering' fact for the bargaining obligation was this composition of the successor's work force." (*Id.* at p. 46; see *id*. at p. 47 [adopting NLRB rule that the determination of the composition of the successor's work force is to be made when a transitioning successor has employed a "'substantial and representative complement'" of its work force; "[i]f, at this particular moment, a majority of the successor's employees had been employed by its predecessor, then the successor has an obligation to bargain with the union that represented these employees"].)

The majority sees nothing in these successorship cases (which presented no preemption issue) to suggest that Congress intended in the NLRA to prevent states and localities from interfering with the employer's right to choose its employees. I cannot agree. From *John Wiley* to *Fall River Dyeing*, these cases show that the employer's free selection of employees has always been a fundamental part of national labor policy. *John Wiley* and *Howard Johnson* could hardly have been more clear: *John Wiley* tells us that the "*objectives of national labor policy*, reflected in established principles of federal law, *require that the rightful prerogative of owners* independently to rearrange their businesses" be balanced "by some protection to the employees from a sudden change in the employment relationship" (*John Wiley*, *supra*, 376 U.S. at p. 549, italics added), and *Howard Johnson* tells us that the high court in *John Wiley* was "concern[ed] with affording protection *to those employees who are in fact retained* in '[t]he transition from one

18

corporate organization to another' from sudden changes in the terms and conditions of their employment . . . ." (*Howard Johnson*, *supra*, 417 U.S. at p. 264, italics added.)

In short, it seems to me incontrovertible that the "objectives of national labor policy," as stated by the high court, have always included the employer's prerogative to select its work force (subject to the prohibition on discrimination on the basis of union membership). As *Howard Johnson* put it, "the employees of the terminating employer have no legal right to continued employment with the new employer . . . ." (*Howard Johnson*, *supra*, 417 U.S. at p. 264.) Consequently, states or cities are not free to regulate to the contrary. (See *John Wiley*, *supra*, 376 U.S. at p. 548 ["Federal law, fashioned 'from the policy of our national labor laws,' controls."]; cf. *Howard Johnson*, *supra*, 417 U.S. at p. 255 [observing that federal common law regarding enforcement of collective-bargaining agreements "must be 'fashion[ed] from the policy of our national labor laws'"].)

The City conceded in oral argument that the ordinance would be preempted by the NLRA if it expressly declared the new owner to be a successor within the meaning of the successorship doctrine, but the City asserted the express 90-day limitation avoids preemption. If the ordinance were unlimited in duration, I think there would be little doubt, under the terms of the ordinance itself, that it would dictate the successorship outcome. The new employer – defined in the ordinance as the person "that owns, controls, and/or operates the Grocery Establishment" (L.A. Mun. Code, § 181.01, subd. I) after the transfer of "all or substantially all of the assets or a controlling interest" (*id*., § 181.01, subd. B) of the old employer – would necessarily be a successor, and would necessarily be bound to bargain with the union representing the workers that the new employer has been required (indefinitely under this scenario) to retain. This scenario would present an

19

obvious intrusion into the collective bargaining process, requiring the employer to bargain with a work force it did not choose.[1]

In my view, the ordinance seeks to do indirectly that which the City acknowledges it cannot do directly, because the practical effect of the ordinance is to visit upon the new owner all the obligations of a successor under the successorship doctrine.  The majority, however, concludes, based on existing NLRB decisions by the agency's administrative law judges (ALJ's) and a federal district court decision, that the new employer will be obligated to bargain "only if the successor employer retains its predecessor's employees beyond the mandatory employment period . . . ."  (*Rhode Island Hospitality Assn. v. City of Providence* (D.R.I. Mar. 31, 2011, No. 09-527-ML) 2011 U.S. Dist. Lexis 34821, *39-*40 (*Rhode Island Hospitality*).)[2]  (Maj. opn. *ante*, at pp. 26-28)  In other words,

---

**1**      In *Wash. Serv. Contractors v. Dist. of Columbia* (D.C. Cir. 1995) 54 F.3d 811, 816, the court, upholding a retention ordinance of unlimited duration against a preemption claim, stated that this argument contains a "logical flaw," because the NLRB may decide *not* to require the new employer to bargain with the union in circumstances where a statute or ordinance requires the employer to retain its predecessor's employees.  According to the court, if the NLRB decides not to require bargaining, then the problem disappears and there is no intrusion in the bargaining process.  And if the NLRB does require bargaining, that would mean that in the NLRB's judgment, the ordinance is congruent with the aims of the NLRA.  (*Wash. Serv. Contractors*, at pp. 816-817.)  In my view, both scenarios miss the mark.  The first (not requiring bargaining) would intrude on the employees' rights to representatives of their own choosing, and the second presumes that the NLRB's judgment would presage that of the high court, a conclusion I find to be unwarranted.  In either case, the ordinance has an impact on, and "'upset[s] the balance that Congress has struck between labor and management in the collective-bargaining relationship.'"  (*Metropolitan Life*, *supra*, 471 U.S. at p. 751.)

**2**      In *Rhode Island Hospitality*, the federal district court upheld the enforcement of a municipal ordinance similar to the one challenged here.  The ordinance required a new employer in the hospitality business to retain the previous employer's workers for three months, subject to a "good cause" right to

*(footnote continued on next page)*

because the ordinance does not in so many words require the employer to maintain the predecessor's work force after 90 days, the ordinance does not dictate the outcome of the successorship inquiry (maj. opn. *ante*, at p. 28) (and therefore does not intrude on the processes of organization, collective bargaining, or labor disputes).

I cannot agree with this analysis.

First, it is entirely uncertain that the obligation to bargain will not arise unless the new employer voluntarily retains the work force after the 90 days. As the *Rhode Island Hospitality* court acknowledged, the two NLRB decisions on the issue are not of a single mind (though both concluded the new employer under a mandatory retention ordinance was a successor with an obligation to bargain). One of them rejected the new employer's contention that it was forced to hire its predecessor's employees (and therefore did not "consciously decide[] to take advantage of its predecessor's trained workforce"); the ALJ observed that the NLRB had "never formally adopted a requirement that a successor employer must consciously decide to avail itself of its predecessor's trained workforce in order to

---

*(footnote continued from previous page)*

discharge. (*Rhode Island Hospitality*, *supra*, 2011 U.S. Dist. Lexis 34821, at pp. *11-*12.) The court acknowledged that the NLRB had "not yet developed a consistent position" on when the duty to bargain would accrue when there is a mandatory retention ordinance (*id*. at pp. *39-*40), that "[t]his is a close case" (*id*. at p. *40), and that the ordinance could not be "simply characterized as a 'minimum labor standard.'" (*Id*. at p. *41.) But, because the ordinance did not preclude an employer from making its own hiring decisions after 90 days, did not compel a successor employer to honor the terms of a collective bargaining agreement negotiated by its predecessor, and allowed the new employer to set employment terms (*id*. at pp. *41-*42), the district court concluded that the ordinance was "primarily designed to provide temporary job protection to both unionized and nonunionized employees which does not constitute a significant intrusion into the equitable collective bargaining process established by the NLRA." (*Id*. at p. *42.)

21

be considered a *Burns'* successor employer . . . ." (*United States Service Industries, Inc.* (NLRB Dec. 13, 1995, No. 5-CA-24575 (1995 NLRB Lexis 1151, *11-*12)) (*Service Industries*).)**3**  In the other case, the ALJ found that successorship obligations attach on the date the new employer makes offers of permanent employment to the workers (or, if no offers are made, at a reasonable time after the expiration of the 90-day period).  (*M&M Parkside Towers LLC* (NLRB Jan. 30, 2007, No. 29-CA-27720 (2007 NLRB Lexis 27, *15-*17)) (*M&M Parkside*).) **4**

---

**3**      In *Service Industries*, a union filed a charge with the NLRB and a complaint was issued alleging the employer refused to recognize and bargain with the union.  The employer's predecessor provided janitorial services to buildings in the District of Columbia and had recognized the union as the exclusive bargaining representative of its janitorial employees.  The predecessor lost its contract to clean a particular building.  The new employer contracted with the building's management, and hired 24 janitorial employees, 15 of whom had been employed by the predecessor.  (*Service Industries*, *supra*, 1995 NLRB Lexis 1151, at pp. *8-*9.)  The union requested bargaining on the terms and conditions of employment, but the new employer refused.  (*Id.* at p. *10.)  The ALJ found substantial continuity in the employing enterprises, but the new employer contended that it was forced to hire its predecessor's employees by the district's Displaced Workers Protection Act.  (*Id.* at p. *11.)  The ALJ rejected the argument, and found the new employer's refusal to recognize and bargain with the union was an unfair labor practice.  (*Id.* at p. *14.)

**4**      *M&M Parkside*, decided 11 years after *Service Industries*, involved a New York City ordinance requiring a purchaser of apartment buildings and commercial property to retain all employees for 90 days (and to offer permanent employment to employees who received a satisfactory written evaluation after 90 days).  (*M&M Parkside*, *supra*, 2007 NLRB Lexis 27, at pp. *3-*4.)  After the 90-day period ended, the purchaser in *M&M Parkside*, while claiming not to be a successor, retained all the seller's employees, established new terms and conditions of employment, and declined the union's request to negotiate and execute a collective bargaining agreement.  (*Id.* at pp. *8-*9.)  In the ensuing proceeding alleging unfair labor practices, the ALJ found the new employer's business was unchanged and the predecessor's employees were the entirety of the work force, so the new employer had a legal obligation to recognize and bargain

*(footnote continued on next page)*

This uncertainty as to when the obligation to bargain attaches, it seems to me, itself demonstrates that the ordinance impermissibly intrudes on the processes of self-organization and collective bargaining that are the exclusive province of the NLRA. The fact is that under the current state of the law, a "[s]uccessor [g]rocery [e]mployer" (defined in the ordinance) (L.A. Mun. Code, § 181.01, subd. I) in a unionized workplace would not know whether it is obliged to bargain, at the request of the union representing the employees it was forced to hire, during that 90-day retention period. The new employer is, at a minimum, exposed to charges of an unfair labor practice if it refuses to bargain.

An obvious illustration of this point would be the case of an employee who files a grievance with the union because he was fired within the first 90 days. The right to continue employment unless there is good cause for termination is a significant benefit ordinarily conferred, if at all, only after the employer and union have negotiated all other terms of employment, and the union has made concessions to offset the employer's "termination for cause only" agreement. The ordinance bestows this benefit upon a unit of employees whom the successor has not chosen to hire. The successor did not obtain concessions from the predecessor in exchange for the promise to hire the predecessor's employees, nor did the successor exercise its right to choose which employees to hire from among the predecessor's work force. Yet if the successor were to fire any employee in the first 90 days (or any time thereafter), it is likely the employee will file a grievance, and if the successor refuses to go through grievance procedures under the

_____

*(footnote continued from previous page)*

with the union. (*Id.* at pp. \*10-\*11.) The ALJ rejected the notion that the local ordinance compelling the employer to retain the employees for 90 days should mitigate against a successorship finding, viewing the argument as a nonsequitur, since the issue was whether the employer had an obligation to bargain after it *chose*, for whatever reason, to hire the predecessor's employees. (*Id.* at pp. \*12-\*14.)

23

predecessor's collective bargaining agreement, the successor risks being found guilty of an unfair labor practice. If the successor were to implement new wages, hours, and benefits without bargaining with the union, the employees might file grievances, demand union negotiation and arbitration, and even walk out or call a strike.

Of course no one can foresee what will occur in any particular case. But the exposure to unfair labor practice charges caused by the ordinance illustrates its intrusion into an area reserved for market freedom. *Machinists* tells us that, just as the state may not prohibit the use of economic weapons such as strikes, lockouts and other "self-help economic activities," the state "may not . . . 'add to an employer's federal legal obligations in collective bargaining . . . .'" (*Machinists*, *supra*, 427 U.S. at p. 147.) It seems to me that the City's ordinance does just that, effectively "'upset[ting] the balance that Congress has struck between labor and management in the collective-bargaining relationship.'" (*Metropolitan Life*, *supra*, 471 U.S. at p. 751.)

The ordinance does not on its face prevent the new employer, after 90 days, from terminating the workers it was forced to employ and hiring its own independent work force. But, once an employment relationship is established, it is not easy to terminate, certainly not without substantial risk. For one thing, it is highly impractical to terminate an entire work force at once, and virtually impossible to do so without business disruption and damage to the new employer's reputation in the community. For another, it is easy to imagine the litigation consequences that would ensue if the employees in a previously unionized workplace are terminated en masse after working for the new employer for 90 days. The likelihood of unfair labor practice charges alleging union animus would be high, as would the likelihood of wrongful termination claims. The majority finds that similar consequences, at least in terms of unfair labor practice charges, would ensue if there were no ordinance and the new employer were free to hire an

24

entirely new work force at the time of acquisition. I disagree. We need not blind ourselves to probable consequences that ordinary experience suggests will occur.

Moreover, it seems obvious that a new employer free to hire as it chooses before going into business does not have to discharge anyone, much less terminate en masse, in order to employ the people it wants to conduct its business, so its exposure to claims necessarily will be significantly different. In effect, the City's ordinance requires a new grocery employer to step into a morass of litigation – and to function during the important initial period of its operations with a work force it deems, for entirely legitimate reasons, unsuitable for its planned operations – if it wishes to exercise its right, recognized under federal labor policy, to hire its own independent work force. (Indeed, this impact was demonstrated at trial, at least in part, by the evidence that, since the City's ordinance was enacted, three different grocers have declined to buy stores in Los Angeles because of the importance to them of choosing their work force.) This is not a result within the contemplation of the NLRA.

In short, the facially temporary nature of the ordinance's interference with an employer's right to select its work force does nothing, in my view, to change the core facts. It is simply unrealistic to believe the temporary nature of the ordinance will not materially affect the successorship inquiry. In reality, whether the obligation to recognize the union ripens on day one, or on day 91, or on some later date, may depend on the various circumstances of each successor grocer's workplace. But there is little room for doubt that, under the law as applied by the NLRB in the decades since *John Wiley* and *Burns*, many successor grocers will be deemed obligated to recognize and bargain with the union at *some* point, as a direct consequence of complying with the ordinance.

Thus, under any of the scenarios that may occur under the ordinance, there is an impact, to a greater or lesser degree, on collective bargaining: either the new employer is a successor who must bargain with the union during the 90-day period and/or shortly thereafter, or the employer must terminate employees en masse after

25

the 90-day period, exposing it to business consequences and legal claims that would otherwise not exist, if it wishes to choose its own work force. The ordinance legislates in an area that federal labor law, clearly articulated by the high court, left unregulated: "the normal exercise of the right of the employer to select its employees" (*Jones & Laughlin*, *supra*, 301 U.S. at p. 45), "'the rightful prerogative of owners independently to rearrange their businesses'" (*Burns*, *supra*, 406 U.S. at p. 301, quoting *John Wiley*, *supra*, 376 U.S. at p. 549), and a new employer's "right not to hire any of the former [employer's] employees, if it so desire[s]" (*Howard Johnson*, *supra*, 417 U.S. at p. 262). To me, the ineluctable conclusion is that the ordinance is preempted under *Machinists* because it regulates "within 'a zone protected and reserved for market freedom.'" (*Brown*, *supra*, 554 U.S. at p. 66.)

### 5. Summary and conclusion

The high court in *Burns* identified the freedom of contract as a fundamental premise on which the NLRA is based—"'private bargaining under governmental supervision of the procedure alone, without any official compulsion over the actual terms of the contract.'" (*Burns*, *supra*, 406 U.S. at p. 287, quoting *H.K. Porter Co. v. NLRB* (1970) 397 U.S. 99, 108.) In the nearly 40 years since *Burns* was decided, the high court has continued to recognize the freedom of every employer and union to reach agreement, or not, in their negotiation of the terms and conditions of employment. This case presents a very different, far more fundamental issue than the freedom of parties who choose to work together to agree on the terms of employment.

The very different question presented here is whether the NLRA evinces an intent to prohibit regulations that interfere with an employer's freedom to choose whether to enter into *any employment relationship at all* with a particular employee or bloc of employees. In my view, the absence of high court precedent saying in so many words that the intent of the NLRA is to preserve the freedom of choice for employees and employers alike to decide whether to form an

employment relationship does not mean states and municipalities are free to enact so-called worker "retention" ordinances.  Rather, the high court has not yet had occasion to address this truly extraordinary intrusion upon the freedom of contract, one that threatens to upend the very foundation of our national labor laws and policies.  Perhaps this case will offer the high court the occasion to address the question now.


**GRIMES, J.***


---

**\***     Associate Justice of the Court of Appeal, Second Appellate District, Division Eight, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** California Grocers Association v. City of Los Angeles
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 176 Cal.App.4th 51
**Rehearing Granted**

_____

**Opinion No.** S176099
**Date Filed:** July 18, 2011
_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Ralph W. Dau

_____

**Counsel:**

Rockard J. Delgadillo and Carmen A. Trutanich, City Attorneys, Laurie Rittenberg, Assistant City Attorney, John A. Carvalho and Gerald Masahiro Sato, Deputy City Attorneys, for Defendant and Appellant.

Schwartz, Steinsapir, Dohrmann & Sommers, Margo A. Feinberg and Henry M. Willis for Intervener and Appellant.

Altshuler Berzon, Michael Rubin, Scott Kronland and Jennifer Sung for American Federation of Labor and Congress of Industrial Organizations and Service Employees International Union as Amici Curiae on behalf of Defendant and Appellant and Intervener and Appellant.

Jones Day, Richard S. Ruben, Craig E. Stewart and Nathaniel P. Garrett for Plaintiff and Respondent.

Deborah J. La Fetra and Timothy Sandefur for Pacific Legal Foundation as Amicus Curiae on behalf of Plaintiff and Respondent.

Mitchell Silberberg & Knupp, Adam Levin, Tracy L. Cahill, Taylor S. Ball; National Chamber Litigation Center, Inc., Robin S. Conrad and Shane B. Kawka for Employers Group and Chamber of Commerce of the United States of America as Amici Curiae on behalf of Plaintiff and Respondent.

Davis, Cowell & Bowe, Richard G. McCracken and Andrew J. Kahn for East Bay Alliance for a Sustainable Economy and Unite Here as Amici Curiae.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Gerald Masahiro Sato
Deputy City Attorney
916 City Hall East
200 North Main Street
Los Angeles, CA  90012-4129
(213) 473-6875

Henry M. Willis
Schwartz, Steinsapir, Dohrmann & Sommers
6300 Wilshire Boulevard, Suite 2000
Los Angeles, CA  90048-5202
(323) 655-4700

Craig E. Stewart
Jones Day
555 California Street, 26th Floor
San Francisco, CA  94104
(415) 626-3939